IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DEREK DANOIS, et al.            :      CIVIL ACTION
                                :
            v.                  :
                                :
i3 ARCHIVE INC., et al.         :      NO. 11-3856

MEMORANDUM

Dalzell, J.                                July 12, 2013

I.   Introduction

     A.   Factual Background

          This dispute arises out of plaintiffs' employment with

defendant i3 Archive, Inc.  We briefly review the facts here,

but because of the sprawling nature of the litigation we will

describe the facts relevant to each claim in far greater detail

below.

          i3, a Delaware corporation, provided "clinical

intelligence and clinical performance management solutions for

the diagnostic imaging sector of the healthcare industry"

through its wholly-owned subsidiary National Digital Medical

Archive, Inc. ("NDMA"), Def. Statement of Undisputed Facts

(hereinafter "Def. Facts") at ¶ 2 (citing Derek Danois Dep.,

Def. MSJ Ex. 1 at 33:17 - 34:17) (hereinafter "Derek Dep.").

Derek Danois began working for i3 on April 1, 2003 as its Chief

Operating Officer and member of i3's Board of Directors.  Apr.

1, 2003 Employment Agreement, Def. MSJ Ex. 3.  In late 2003 Mr.

Danois began a romantic relationship with Diane Danois, née Hockstein, and around that time Ms. Danois also joined i3's Board of Directors.[1]  Derek Dep. at 123:24-130:22; Diane Danois Dep., Def. MSJ Ex. 4, at 29:19 - 30:19 (hereinafter "Diane Dep.").  Over the next several years, both Mr. and Ms. Danois took on positions of greater authority and remuneration within i3, such that by November of 2007 both Mr. and Ms. Danois were serving on i3's Board of Directors, Mr. Danois was i3's Chief Executive Officer and received a base salary of $350,000, see Def. Facts ¶¶ 36 - 37 (citing Nov. 5, 2007 Email to Michele Janis, Def. MSJ Ex. 18).  Ms. Danois was serving as i3's Vice President for Marketing and Consumer Affairs, id. at ¶ 18 (citing Dec. 1, 2004 Employment Letter Agreement, Def. MSJ Ex. 9).  In 2007 i3 paid Ms. Danois $154,062.50 in gross compensation.  Id. at 39 (citing Paychex Year to Date Report, Def. MSJ Ex. 14).

Mr. and Ms. Danois married on July 3, 2008.  They neglected to tell i3's Board of Directors that they had done so.  Derek Dep. at 125:14-20; 156:23 - 157:2.

i3 struggled financially throughout this period, and in January of 2009 i3's Board proposed issuing two new rounds of equity financing.  Def. Facts at ¶ 65.  To effectuate this

---

[1] For simplicity, we will refer to Diane Danois as Ms. Danois throughout this Memorandum.

transaction, i3 signed a Promissory Note with Mr. Danois after i3 supplied him with $220,041.94 so he could exercise some of his stock options. Id. at ¶¶ 66 - 68. According to the terms of the Note, Mr. Danois would be obliged to repay i3 if the company fired him -- under terms we discuss at length herein. Promissory Note, Comp. Ex. A. Simultaneously, Mr. Danois and i3 entered into a letter agreement for a Put Option which provided that if i3 fired Mr. Danois without cause Mr. Danois could, during a period of ninety days following the effective date of his termination, require i3 to buy back the shares he purchased with the Promissory Note. See Jan. 21, 2009 Letter, Comp. Ex. 2 at 1.

In November of 2009, Mr. Danois proposed a plan for reducing i3's operations whereby i3 would fire him and Ms. Danois, among other employees. Pl. MSJ at 4 (citing Terker Dep., Pl. MSJ Ex. F at 162; Turnbull Dep., Pl. MSJ Ex. G at 35-36). i3 carried out the plan, and on November 30, 2009 it fired Mr. and Ms. Danois. Nov. 30, 2009 National Digital Media Archive, Inc., Board of Directors Minutes, Pl. MSJ Ex. I at i3-110472.

Ms. Danois remained on the Board, see Nov. 30, 2009 Minutes of Meeting of the Board of Directors for National Digital Medical Archive, Inc. Between December 7 and 14, 2009

the Board learned of Mr. and Ms. Danois's long-time romantic
relationship and later marriage, Bruce Terker Dep., Def. MSJ Ex.
5, at 137:8-17, and on December 15, 2009 Mark Turnbull, the
Chair of the Boards of i3 and National Digital Media Archive,
Inc., made a motion to remove Mr. and Ms. Danois from their
positions and offices with both companies, and both boards
unanimously approved those motions.  Dec. 15, 2009 Minutes, i3
Archive, Inc. Board of Directors, Def. MSJ Ex. 43; Dec. 15, 2009
Minutes, National Digital Media Archive, Inc. Board of
Directors, Def. MSJ Ex. 44.

Disagreements ensued about Mr. and Ms. Danois's
conduct during and immediately after their tenure with i3, their
compensation, their continued healthcare coverage, and the
repayment of the Promissory Note.  This action followed.

B.    Procedural Posture

Before us are both parties' partial motions for
summary judgment.  The complaint includes three Counts: in Count
I Mr. Danois requests a declaratory judgment regarding the
Promissory Note; Count II asserts a violation of the
Pennsylvania Wage Payment and Collection Law, 43 Pa. Stat. Ann.
§ 260.1; and Count III, which plaintiffs bring under 29 U.S.C. §
1132(a)(3), concerns plaintiffs' right to health insurance under
the Consolidated Omnibus Budget Reconciliation Act (COBRA).  Not

4

to be outdone, the defendants counterclaim with nine Counts.
Counterclaim Count I alleges that Mr. Danois breached the
contract contained in the Promissory Note; Counterclaim Count II
alleges that Ms. Danois breached her employment contract; Count
III of the Counterclaim avers that Mr. Danois violated the
Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. §§
5301 et seq.; Counterclaim Count IV asserts that Mr. Danois
converted i3's property; Count V alleges that Mr. and Ms. Danois
breached their fiduciary duties to i3; Count VI claims Mr.
Danois violated the Computer Fraud and Abuse Act, 18 U.S.C. §
1030(a)(5)(A); Count VII asserts that Mr. and Ms. Danois wasted
corporate assets; Count VIII alleges unjust enrichment; and
Count IX alleges that Mr. and Ms. Danois engaged in a civil
conspiracy to breach their fiduciary duties and commit corporate
waste of i3's assets.

We have jurisdiction over the federal claims in Count
III of the complaint and Count VI of the counterclaim pursuant
to 18 U.S.C. § 1331, as well as jurisdiction over the state law
claims pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1332.[2]

---

[2] We exercise diversity jurisdiction pursuant to 28 U.S.C. § 1332
because the amount in controversy exceeds $75,000 and the
parties are diverse: plaintiffs are citizens of Florida, the
individual defendants are Pennsylvania citizens, and i3 is a
Delaware corporation with its principal place of business in
Pennsylvania. See Comp. ¶¶ 1 - 7; Answer ¶¶ 1-7.

The plaintiffs move for summary judgment on all counts of their complaint and on Counts I, III, and VI of the counterclaim. The defendants move for summary judgment on Counts I and II of the complaint and Counts I and V of the counterclaim.

## II. Standard of Review

A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact", Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party carries this initial burden, Fed. R. Civ. P. 56 then obliges "the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.

A factual dispute is genuine

> [I]f the evidence is such that a reasonable
> jury could return a verdict for the
> nonmoving party. . . . The mere existence of
> a scintilla of evidence in support of the

> plaintiff's position will be insufficient;
> there must be evidence on which the jury
> could reasonably find for the plaintiff.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

A fact is "material" if it "might affect the outcome of the suit

under the governing law". Id. at 248.

We "must draw all reasonable inferences in favor of

the nonmoving party, and [we] may not make credibility

determinations or weigh the evidence." Reeves v. Sanderson

Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), cited in Amour

v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)).

## III.  Breach of Fiduciary Duty

We consider first the defendants' motion for summary

judgment on Count V of its counterclaim -- breach of fiduciary

duty.  The defendants argue that (1) Mr. and Ms. Danois breached

their fiduciary duties by engaging in self-interested

transactions, and (2) Ms. Danois breached her fiduciary duty by

taking outside work while in i3's employ.  Counterclaim ¶¶ 158-

59; Def. MSJ at 9-15.

### A.  Factual Background

#### 1.  Self-Interested Transactions

In their response to the defendants' motion for

summary judgment, plaintiffs argue that "there is a contested

issue of material fact as to whether the other Board members in fact knew of" the romantic relationship between Mr. and Ms. Danois.

The defendants offer evidence that Mr. and Ms. Danois did not reveal their marriage to the Boards of i3 and NDMA.  Ms. Danois testified that she never discussed her relationship with Mr. Danois with her colleagues.  After stating, "I didn't talk about it,", Diane Dep., Def. MSJ Ex. 4 at 175:4, she testified:

> Q:  Did any member of the board ever ask you to confirm or, you know, whether or not you were having a personal relationship with Derek?
>
> A:  No.  No.  And if they had, I would have said I have a personal relationship and I have a professional relationship.  But I wasn't asked.

Id. at 177:24 - 178:7.  Mr. Danois gave cognate testimony:

> Q:  Did you tell anyone from i3 about the wedding before it happened?
>
> A:  No.
>
> Q:  Did you tell anyone from i3 about the wedding in the days following or when you returned from after the wedding?
>
> A:  No, I don't recall doing that.

Derek Dep., Def. MSJ Ex. 1 at 125:14 - 20.

The defendants have also produced evidence that Mr. and Ms. Danois took steps consistent with hiding their marriage. Mr. Danois testified that he did not change his filing status on

his W-4 tax form to reflect that he was married, Derek Dep. at 157:3-9, and when they traveled together for work Mr. and Ms. Danois stayed in separate hotel rooms.  Diane Dep. at 209:19-22.

The plaintiffs do not contend that they told the Boards of their marriage, but they argue that there is a dispute of fact as to whether Mr. Danois told Mark Turnbull of the romantic relationship, and, as we discuss below, plaintiffs contend that this dispute precludes summary judgment on the breach of fiduciary duty claim.

In support of the argument that Mr. Danois told Turnbull of the romantic relationship, the plaintiffs cite Mr. Danois's deposition testimony:

> A: . . . I remember one opportunity in which [Turnbull] brought up to me that someone had approached him about a suspicion of us having a relationship.  You know, I acknowledged it, but, you know, his reaction to me is it wasn't -- as long as it didn't conflict with the company, it didn't matter to him so he wasn't going to really -- it wasn't something we needed to discuss.
>
> Q:  So essentially you confirmed the relationship to him?
>
> A:  Yes.
>
> Q:  And you think that was in the 2006 time frame?
>
> A:  It's hard to be sure.

Derek Dep. at 128:4-15.  In her deposition, Ms. Danois also noted that she believed Mr. Danois had told Turnbull that the relationship was romantic: "Mark Turnbull was aware of the personal relationship", Diane Dep. at 180:7-8.  Ms. Danois testified that this understanding was based on Mr. Danois telling her that he had spoken to Turnbull about the relationship, though she had not had "any personal communications with Mark Turnbull about the nature" of the relationship.  Id. at 180:18-23.

In his deposition Turnbull denied knowing that Mr. and Ms. Danois had a romantic relationship while at i3.  Turnbull testified that he first learned that Mr. and Ms. Danois were married in early December of 2009 when Bruce Terker, another member of i3's Board, told him of the marriage.  Turnbull Dep. at 74:16 - 76:7.  According to Turnbull, this was the first he knew of any romantic relationship between the two, and Turnbull implied that Mr. Danois did not disclose the relationship when he tried to discuss it:

> Q:  Now, prior to Mr. Terker informing you of this, did you have any knowledge of the Danoises having any sort of personal relationship?
>
> A:  Absolutely not.
>
> Q:  Did you have any suspicions in that regard?

A:  I talked to Mr. Danois about it several
times and because I was asked by Mr. Terker
and Mr. Keller, so I confronted Derek with
it a few times.

. . .

Q:  Now, did you ask Mr. Danois on more than
one occasion whether he had a personal
relationship with Ms. Danois?

A:  I did.

Q:  And were there other events that
triggered your inquiring again?

A:  My own -- there was my own inquiry and
then inquiring because I was asked by others
. . . Bruce Terker and Joe Keller separately
talked to me about it.  And I was often
asking Derek what Diane did since she had no
apparent qualifications other than she
invested in the company, and we didn't see
any revenue result from any of her alleged
business development.

Q:  And based on that, did that raise some
suspicions in your mind that they had some
sort of personal relationship?

A:  Well, I walked carefully around that
topic because Mr. Danois would often appear
offended that I would make such an inquiry,
and it's very simple that -- why were we
paying somebody the kind of money we were
paying Diane, and she's not producing any
results.  So he would often defend her,
explain that she was extremely important to
the company.  That's what gave me rise to my
suspicion.

Turnbull Dep., Def. MSJ Ex. 2 at 76:15 - 77:1; 79:22 -

81:6.

11

Throughout their time with i3, both Mr. and Ms. Danois entered into employment agreements with each other on i3's behalf and negotiated and voted on the terms of each other's employment. In July of 2004, Ms. Danois began providing consulting services for i3, and Mr. Danois executed the consulting contract on the company's behalf. See July 1, 2004 Consulting Agreement, Def. MSJ Ex. 6. The plaintiffs contend that they did not have a romantic relationship at this time. Pl. Resp. in Opp. to Def. MSJ at 11. Around October of 2004, Ms. Danois began providing business development services to i3, and entered a new consulting agreement that Mr. Danois executed on behalf of i3. See Oct. 1, 2004 Consulting Agreement, Def. MSJ Ex. 8. On December 8, 2004, i3 hired Ms. Danois as its Vice President for Marketing and Consumer Affairs and Mr. Danois signed the letter agreement containing the terms and conditions of employment on behalf of i3. See Dec. 1, 2004 Employment Letter Agreement, Def. MSJ Ex. 9.

In April of 2005, Mr. Danois and i3 entered into a letter agreement terminating his 2003 Employment Agreement except for the provisions set forth in the letter, and he and i3 committed to "begin to negotiate in good faith in a reasonably prompt fashion the terms of a new employment agreement", April

8, 2005 Agreement, Def. MSJ Ex. 10.  Ms. Danois executed that agreement on behalf of i3.

In August of 2005, Mr. Danois signed on i3's behalf an Award Agreement awarding Ms. Danois an additional 446,140 options for shares of i3's common stock.  Aug. 24, 2005 Incentive Plan Award Agreement, Def. MSJ Ex. 11.  In December of 2005, Mr. Danois executed another Award Agreement on i3's behalf awarding Ms. Danois another 251,020 options for share of i3's common stock.  Dec. 30, 2005 Incentive Award Agreement, Def. MSJ Ex. 13.

In June of 2007, the Board of Directors -- including Mr. Danois -- approved a five percent increase in Ms. Danois's annual salary.  See June 20, 2007 Letter to Diane Hockstein, Def. MSJ Ex. 15.

On August 23, 2007, i3's Board of Directors authorized the Compensation Committee "in its sole discretion, to increase the salary of Derek Danois and to report back to the Board the effective date of such salary increase", Aug. 23, 2007 Minutes, Meeting of the Board of Directors for i3 Archive, Inc., Def. MSJ Ex. 16.  Ms. Danois voted for this authorization.  Id.  On October 16, 2007, i3's Board of Directors voted to award Mr. Danois 1,022,904 options to purchase i3 Class A Common Stock, and Ms. Danois again voted in favor of this award.

On June 26, 2008, the Compensation Committee agreed to recommend to the Board of Directors that i3 increase Ms. Danois's salary from $157,500 to $180,000 and award her additional options to purchase 297,840 shares of i3's common stock. June 26, 2008 Minutes, Meeting of the Compensation Committee for NDMA, Def. MSJ Ex. 19. Mr. Danois told William Burns, i3's President, to make the salary increase effective June 15, 2008. June 30, 2008 Email to William Burns, Def. MSJ Ex. 21; July 4, 2008 Email to William Burns, Def. MSJ Ex. 22. On September 16, 2008, the Board of Directors -- including Mr. Danois -- voted to approve the Compensation Committee's recommended increases to Ms. Danois's compensation. Sept. 16, 2008 Minutes of Meeting of Board of Directors for i3 Archive, Inc., Def. MSJ Ex. 24.

Finally, on December 7, 2009, Ms. Danois moved to authorize an adjustment of Mr. Danois's Promissory Note to extend the commencement of his monthly repayments by three years and authorize a possible two-year extension for Mr. Danois to exercise his vested stock options. Dec. 7, 2009 i3 Board of Directors Minutes, Def. MSJ Ex. 41. The Board approved the motion unanimously, id., although at the December 14, 2009 meeting -- after the other members had learned of the Danoises'

marriage -- the Board nullified the motion.  Dec. 14, 2009 i3
Board of Directors Minutes, Def. MSJ Ex. 42.

### 2. Outside Work

In her 2004 employment letter agreement, Ms. Danois
agreed that she would devote her "full working time, energy,
skill and experience in the performance of [her] duties", Dec.
1, 2004 Employment Letter Agreement, Def. MSJ Ex. 9 at ¶ 3(e).
It is undisputed that i3 employed Ms. Danois until November 30,
2009.

On November 5, 2008, Ms. Danois began working as an
associate with the law firm Ross Feller Casey, LLP, Ross Feller
Casey, LLP Attorney Orientation Form, Def. MSJ Ex. 25.  In 2008
Ms. Danois received $14,615.37 in wages from the firm.  Ms.
Danois Hockstein 2008 W-2 Form, Def. MSJ Ex. 27.  On April 29,
2009, Ms. Danois emailed i3's Finance Director attaching a
paystub from Ross Feller Casey and asking that he keep the
information confidential.  Apr. 29, 2009 Email to Gary Martin,
Def. MSJ Ex. 28.  In 2009, Ms. Danois received $50,384.59 in
wages from Ross Feller Casey.  Diane Hockstein 2009 W-2 Form,
Def. MSJ Ex. 27.

B.    Discussion

Because i3 is a Delaware corporation, it is undisputed that Delaware law governs the defendants' breach of fiduciary duty claim.  See, e.g., Delta Star, Inc. v. Patton, 76 F. Supp. 2d 617, 634 (W.D. Pa. 1999).

1.    Compensation Claims

We consider first the argument that the plaintiffs breached their fiduciary duties by engaging in self-interested transactions when, "[w]hile failing to disclose their personal relationship, Mr. and Mrs. Danois repeatedly voted to increase their spouse's compensation . . . and acted to approve that compensation on behalf of i3."  Def. MSJ at 14.  Because we find that there is a genuine issue of material fact as to whether the Danoises disclosed their romantic relationship before they were married, and because we find that there is a genuine issue as to the material fact of whether the transactions governing their compensation after they were married were fair, we will deny summary judgment on this claim.

Under Delaware law, directors owe a duty of loyalty -- initially articulated in Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939) -- whereby "[c]orporate officers and directors are not permitted to use their position of trust and confidence to further their private interests".  Id. at 510.  See also, e.g.,

Schoon v. Smith, 953 A.2d 196, 206 (Del. 2008) (quoting Guth on this point).

Directors' decisions are presumptively entitled to review under the business judgment rule, as the Chancery Court explained in Reis v. Hazelett-Strip-Casting Corporation, 28 A.3d 442, 457) (2011) (the business judgment rule is "the default standard of review" for "evaluating director decision-making"). A court applying the business judgment rule will uphold a Board's decision "unless it cannot be attributed to any rational purpose."  Id. (quoting In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 74 (Del. 2006)).  Under the business judgment presumption, a court will apply the business judgment rule, and "directorial conduct when challenged will be presumed to be non-culpable," so a party seeking to "impose liability upon directors for such conduct must 'rebut' the presumption by alleging facts which if true would support culpability", 1 David A. Drexler et al., Delaware Corporation Law and Practice § 15.04 at 15-11 (2012).

A party may overcome the business judgment presumption by demonstrating that a director's action was "interested", a term of art under Delaware corporate jurisprudence.  See, e.g., Telxon Corp. v. Meyerson, 802 A.2d 257, 265 (Del. 2002).  The Delaware Supreme Court explained the rationale for this rule in

Schoon: "director independence inheres in the conception and rationale of the business judgment rule. The presumption of propriety . . . is based in part on th[e] unyielding precept [that] a director's decision is based on the corporate merits . . . rather than extraneous considerations or influences." Schoon, 953 A.2d at 207 (quoting Aronson v. Lewis, 473 A.2d 805,816 (Del. 1984)) (original alterations omitted). As Drexler explains, "[a] director is 'interested' in a corporate decision when there are factors weighing upon his exercise of judgment with respect to that decision which conflict or are inconsistent with the concept of a single, uncompromised loyalty to the corporate interest," and "such an 'interest' most conventionally exists when directors have a personal financial stake antithetic to the corporate interest in a corporate transaction", Drexler at § 15.05[1] at 15-12.

If a party overcomes the business judgment presumption by demonstrating that a director was "interested", Delaware courts will review the transaction according to the more rigorous entire fairness standard: "It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." HMG/Courtland Properties, Inc. v. Gray, 749

A.2d 94, 115 (Del. Ch. 1999) (quoting Boyer v. Wilmington Materials, Inc., 754 A.2d 881, 898 (Del. Ch. 1999)) (further internal quotations omitted).

A demonstration that one director controlled another will also rebut the business judgment presumption: "relationships outside of the board room between [an interested party] and the ostensibly financially disinterested director[] can impact upon the latter's objectivity and allow the drawing of an inference that . . . the director lacks the independence necessary to maintain . . . the business judgment presumption." Drexler at § 15.05[1A] at 15-19. As the Supreme Court of Delaware has explained, "A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will." Telxon Corp., 802 A.2d at 264 (citing Orman v. Cullman, 794 A.2d 5, 25 n.50 (Del. Ch. 2002)) (emphasis added).

An interested director's decisions may be saved from entire fairness review -- and instead receive the deference of the business judgment rule -- if the director has disclosed his interest to the rest of the Board. See, e.g., Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1168 (Del. 1995) ("a material interest of 'one or more directors less than a majority of those voting' would rebut the application of the business judgment

rule" only "if the plaintiff proved that 'the interested

director . . . <u>fail[ed] to disclose his interest</u> in the

transaction to the board <u>and</u> a reasonable board member would

have regarded the existence of the material interest as a

significant fact in the evaluation of the proposed

transaction.") (quoting <u>Cinerama, Inc. v. Technicolor, Inc.</u>, 663

A.2d 1134 (Del. Ch. 1994)) (emphasis in original).[3]

As an initial matter, the Danoises argue that we

cannot decide to apply the entire fairness review rather than

the business judgment rule at this juncture because there is a

genuine issue of material fact as to whether they disclosed

their romantic relationship to the Board.

---

[3] In support of this proposition, i3 quotes <u>HMG/Courtland
Properties, Inc. v. Gray</u>, 749 A.2d 94, 114-15 (Del. Ch. 1999).
The passage i3 cites concerns disclosure in the context of 8
Del. C. § 144(a)(1). Section 144 governs when an interested
transaction is voidable -- which is not our direct concern here.
As the Delaware Supreme Court explained in <u>Cinerama</u>,

> The inquiry whether a board is independent
> and disinterested, etc. for purposes of
> determining whether it qualified for the
> business judgment rule presumption is
> somewhat similar to this Section 144
> analysis but can't be the same, since the
> business judgment form of review analysis
> inquiry must admit of the possibility that,
> if there is no material interference with
> the independence of the board's process,
> that business judgment review is possible.

663 A.2d at 1169 (quoting the Chancery Court's decision in
<u>Cinerama</u>, 663 A.2d at 1154).

The Danoises do not contend that they told the Board of their marriage.  Indeed, even the most favorable reading of Mr. Danois's deposition testimony about his conversations with Turnbull does not allow us to infer that Mr. or Ms. Danois disclosed their marriage to Turnbull or any other Board member.  See Derek Dep. at 125:14-20.

Marriage creates a presumptive interest in financial transactions involving one's spouse.  See, e.g., Reis v. Hazelett Strip-Casting Corp., 28 A.3d 442, 460 (Del. Ch. 2011) (wife's interests "presumptively aligned with" her husband's) (citing Harbor Fin. P'rs v. Huizenga, 751 A.2d 879, 889 (Del. Ch. 1999) ("Close familial relationships between directors can create a reasonable doubt as to impartiality") and Chaffin v. GNI Grp., 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) (father-son relationship rebuts presumption of independence)).  Thus, there is no genuine dispute that with regard to the decisions made after their July 3, 2008 wedding -- Mr. Danois's September 16, 2008 vote on Ms. Danois's compensation and Ms. Danois's December 7, 2009 vote on Mr. Danois's repayment -- Mr. and Ms. Danois had an interest that they did not disclose such that those decisions are subject to entire fairness review.

As the Delaware Supreme Court has explained, a finding that the business judgment rule does not apply does not create per se liability for directors.  Cinerama, 663 A.2d at 1162. Instead, where "the presumption of the business judgment rule has been rebutted, the board of directors' action is examined under the entire fairness standard."  Id. (citing Unitrin, Inc. v. American Gen. Corp., 651 A.2d 1361, 1371 (Del. 1995) (collecting cases)).

Under the entire fairness standard, the Court considers whether the transaction both involved fair dealing and resulted in a fair price:

> The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, [etc.].

Id. (quoting Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983).  But "the test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness."  Id. at 1163 (quoting Weinberger, 457 A.2d at 711).

The Danoises contend that there is a genuine issue of material fact as to the fairness of the process and the price, such that summary judgment is inappropriate on these claims. They argue that "in each instance of a salary offer or adjustment to the Danoises, the process was full and fair, and any vote or input by Mr. or Mrs. Danois at the director level could not reasonably have affected the outcome." Pl. Resp. in Opp. to Def. MSJ at 9. They note that "in every instance of a salary increase and/or stock option award for Mr. and Mrs. Danois, the original recommendation for such salary and options were made by the Compensation Committee of the Board", id. -- which did not include either Danois.

It is true that decisionmaking by an independent compensation committee may render a transaction that benefits an interested director fair, see, e.g., Valeant Pharmaceuticals Int'l v. Jerney, 921 A.2d 732, 745-46 (Del. Ch. 2007), because "[t]he key to upholding an interested transaction is the approval of some neutral decision-making body." Cinerama, Inc., 663 A.2d at 1170 (quoting Oberly v. Kirby, 592 A.2d 445, 467 (Del. 1991)).

Here, however, i3 contends that the Danoises' non-disclosure of their true relationship tainted the neutrality of the compensation committee's deliberations, thus rendering the

process unfair. i3 argues that "Mr. and Mrs. Danois made representations to the Board about each others' [sic] value, and the Board reasonably relied on those representations in deciding to retain them. As inside directors, the other members of the Board relied heavily on their judgment, especially regarding personnel decisions." Def. Reply in Supp. of MSJ at 5. In support, i3 points to Terker's deposition testimony:

> Q: At any time, did you object to the level of compensation that Ms. Hockstein was receiving under her consulting agreement?
>
> A: I would have raised a concern about it. I relied on Derek as head of the company to make the right decisions.
>
> Q: Do you have a specific recollection of raising a concern about it with Derek?
>
> A: I'm sure that I would have raised a question about it.

Terker Dep., Def. Reply Ex. 61 at 33:22 - 34:7.

The plaintiffs respond that Ms. Danois's compensation reflects a fair price, such that the total fairness of the transaction is not affected by non-disclosure. In support, they cite Burns's testimony in which he recalled that before her 2008 salary increase Ms. Danois told him that she thought her base compensation should be about $200,000. Burns Dep., Pls. Resp. Ex. W at 19 - 22. He described his reaction: "I thought it was fair. It was within what we would consider the equity -- or the

employee equity curve for positions that we had in those roles .
. . it wasn't an outrageous request.  It was within the norm of
what employees were receiving in that area."  Id. at 17:3 - 10.
Burns further testified that knowing that Mr. and Ms. Danois
were married at the time he made the recommendation to the
compensation committee would not have affected his
recommendation.  Id. at 44:1 - 13.

        The determination of entire fairness is highly fact-
specific.  Cf. Levitt v. Bouvier, 287 A.2d 671, 673 (Del. 1972)
(appellate courts reviewing trial courts' findings regarding
entire fairness are to accept those findings as long as "they
are sufficiently supported by the record and are the product of
an orderly and logical deductive process").  Here, there is a
genuine issue of material fact as to the overall fairness of the
transactions governing Mr. and Ms. Danois's compensation after
they were married, such that we will not grant summary judgment
for i3's breach of fiduciary duty claims with regard to those
transactions.

                ii.  Pre-Marriage Transactions

        We must also consider whether there is a genuine issue
of material fact regarding disclosure of their true relationship
for the Board decisions Mr. and Ms. Danois participated in
before their marriage and which i3 challenges -- Mr. Danois's

                              25

vote in June of 2007 to increase Ms. Danois's compensation by
five percent and Ms. Danois's votes in August and October of
2007 to increase Mr. Danois's salary and award him stock
options.[4]

i3 argues that there is no genuine dispute that Mr.
and Ms. Danois did not disclose their relationship because
plaintiffs rely solely on their own deposition testimony to
create an issue of fact, and the Third Circuit has extended to
deposition testimony the principle that "conclusory, self-
serving affidavits are insufficient to withstand a motion for
summary judgment." Def. Reply in Support of MSJ at 2-3 (quoting
Gonzalez v. Sec'y of the Dep't of Homeland Sec., 678 F.3d 254,
263 (3d Cir. 2012) and citing Irving v. Chester Water Auth., 439
Fed. Appx. 125, 127 (3d Cir. 2011)).

In Irving, our Court of Appeals considered a situation
in which the only testimony suggesting a genuine issue of

_____

[4] The Danoises argue that because they were not married at this
time they were not interested in votes on each other's
compensation. This argument doubly fails. First, the
definition of "interest" is broader than the Danoises suggest.
As we noted above, interest does not depend on a categorical
analysis. Instead, a director is "interested" if there are
"factors weighing upon his exercise of judgment with respect to
that decision which conflict or are inconsistent with the
concept of a single, uncompromised loyalty to the corporate
interest", Drexler at § 15.05[1] at 15-12 (2012). Second, even
if Mr. and Ms. Danois did not each have a personal stake in the
other's compensation -- a proposition we do not concede -- their
romantic relationship could lead each to be controlled by the
other such that each would lack the requisite independence for
disinterest.

material fact came from a plaintiff who had previously given contradictory testimony. <u>Irving</u>, 439 Fed. Appx. at 127. Here, Mr. Danois testified consistently that he told Turnbull he had a relationship with Ms. Danois. <u>See, e.g.</u>, Derek Dep. at 128:4-10. Though Mr. Danois's testimony is vague and contradicts Turnbull's testimony, determining which account to believe is exactly the kind of credibility determination we may not make in deciding a motion for summary judgment, and so we find a genuine issue of material fact exists as to whether the Danoises disclosed their pre-marriage romantic relationship to the Board and, thus, whether their actions are entitled to the deference of the business judgment rule.[5]

We thus decline to grant summary judgment with regard to i3's breach of fiduciary duty claim on this ground.

---

[5] Because we reach this conclusion with regard to all pre-marriage actions, we need not reach the Danoises' argument that even if they did not disclose their interest in the transactions neither Mr. nor Ms. Danois was involved in "negotiating" several of the agreements i3 challenges -- specifically, Ms. Danois's 2004 consulting agreement and her two 2005 award agreements and Mr. Danois's November 2005 employment agreement. The Danoises argue that although Mr. Danois executed the agreements with Ms. Danois on i3's behalf, "there is simply no evidence that he played any role in the drafting or negotiation of [the agreements'] terms, and i3 has not set forth any facts (other than his name appearing on the agreements themselves) to support an allegation of self-dealing." Pl. Resp. in Opp. to Def. MSJ at 12. The parties have not briefed us on the level of scrutiny we are to apply to contracts which an interested director has executed, and we need not consider the issue here.

2. <u>Outside Work</u>

i3 also moves for summary judgment on the claim that Ms. Danois breached her fiduciary duties by taking a job with the firm Ross Feller Casey LLP, while working for i3, when outside employment was expressly prohibited by the terms of her employment agreement. Def. MSJ at 14. The defendants also argue that Mr. Danois breached his duty of loyalty on the basis of Ms. Danois's employment because he failed to notify the other Board members when he learned that she took outside employment.

The plaintiffs counter that Alex Pearl, a member of the i3 Board, knew that Ms. Danois had taken the job, citing Pearl's deposition testimony:

> Q: [A]t some point, did you come to learn that Ms. Hockstein had been hired by a law firm to perform legal services during the time that she was employed at i3 or NDMA?
>
> A: I recall something about that . . .
>
> . . .
>
> Q: Do you recall whether you ever raised the issue of Diane's outside employment at a board of director's meeting in front of the board as a whole?
>
> A: Yes.
>
> . . .
>
> Q: Okay. You do recall that the issue was raised?
>
> A: I believe so.

> . . .
>
> A:  I don't recall if the conversation was
> actually part of the board meeting, before
> the board meeting actually began as a board
> meeting, or after the board meeting ended,
> and whom it was with.  I just remember
> generally that there was a discussion around
> the board meeting, but I cannot tell you
> with any definitive accuracy without looking
> at minutes or something to refresh my memory
> when that conversation took place . . .
>
> Q:  Is it your recollection that the
> conversation was among board members as
> opposed to other employees of the company?
>
> . . .
>
> A:  I don't believe that I would have had
> such conversation with anyone other than an
> officer or director . . .

Pearl Dep., Pl. Resp. in Opp. to Def. MSJ Ex. T at 25:11 - 42:6.

The Danoises also point to an email Pearl wrote to Mr.
Danois in which he described Ms. Danois's position as "No Big
deal".  Nov. 24, 2008 Email, Pl. Resp. in Opp. to Def. MSJ Ex.
Y.

According to plaintiffs, Pearl's knowledge of Ms.
Danois's outside employment and his recollection of discussing
that employment with other Board members raises genuine issues
of material fact as to whether "(1) i3 ratified Ms. Danois's
conduct and/or (2) i3 should be equitably estopped from claiming
damages resulting from the purported breach, and/or (3) whether
the equitable doctrine of laches should apply, in addition to

what damages, if any, were suffered as a result of the breach."
Pl. Resp. in Opp. at 19.

Without addressing the plaintiffs' arguments regarding equitable estoppel and laches, we agree that the question of whether the Board knew and approved of Ms. Danois's outside employment raises a genuine issue of material fact as to whether the Board ratified her conduct. We note that Pearl sent the email in which he acknowledged her outside employment in November of 2008, over one year before Ms. Danois was fired from i3 for unrelated reasons. We will thus not grant summary judgment for i3's breach of fiduciary duty claim on this ground.

## IV. Count I of the Complaint and Count I of the Counterclaim

We consider here the cross-motions for summary judgment on Count I of the complaint and Count I of the counterclaim, which concern the Promissory Note.

### A. Factual Background

In January of 2009, i3's Board of Directors proposed issuing two new rounds of equity financing, Series D and E, so that the company could continue operations. Def. Facts ¶¶ 65, 76; May 22, 2012 Derek Dep., Def. Mot. Ex. 1, at 63:3-16. Issuing Series D and E stock required a change to i3's Charter and Articles of Incorporation, which required approval by a

majority of votes from the Common Class A shareholders. Def. Facts ¶ 67; Jan. 13, 2009 Email from Alex Pearl, Def. Mot. Ex. 30. In order to secure this majority vote, i3's counsel recommended that Mr. Danois exercise a subset of his stock options so that he would become the majority common stock shareholder, and he could then vote to approve the transaction. Def. Facts ¶ 67; Derek Dep. at 63:10-16.

In order to facilitate Mr. Danois's exercise of his stock options, i3's counsel recommended that the company execute a Promissory Note with him in the principal amount of $220,041.94 -- which Mr. Danois and i3 did. Def. Facts ¶ 68; Derek Dep. 64:10-12; Promissory Note, Comp. Ex. 1.

The Note enabled Mr. Danois to purchase 1,775,964 shares of common stock, and it provided that "the entire principal balance of the promissory note payable pursuant to this Note, plus accrued interest as described herein, shall become due and payable on January 20, 2014." Promissory Note ¶ 1.

This repayment provision was subject to a "Recourse Obligation", which provided that "[i]f, for any reason, Borrower fails to pay the full amount due hereunder, Borrower's maximum personal liability shall be an amount equal to twenty-five

percent (25%) of the principal balance of this Note." Id. at ¶ 3.

The Note further provided for accelerated payment if i3 fired Mr. Danois. Id. at ¶ 7. If the company fired him without cause, the Note provided that "Borrower shall be required to pay in equal monthly installments, commencing within ten (10) days following the date of such termination of employment or service, the principal balance due under this Note and accrued interest thereon." Id. at ¶ 7(d) (emphasis added). If, on the other hand, i3 fired him for cause (as we will soon define), the Note provided that "Borrower shall be required to pay in a lump sum within ten (10) days of such resignation or termination of employment or service, as the case may be, the principal balance due under this Note and accrued interest thereon." Id. at ¶ 7(c).

The Note is dated January 21, 2009. On the same day, Mr. Danois entered into a letter agreement with i3 which the parties refer to as a "Put Option." Under the Put Option, if i3 fired Mr. Danois without cause, as defined in the letter, Mr. Danois would have the right, for ninety days following the effective date of his termination, to force i3 to buy back the shares he purchased with the Promissory Note. See Jan. 21, 2009 Letter, Comp. Ex. 2 at 1.

The Put Option defines "cause" as:

> (1) [Mr. Danois's] breach of the
> Confidentiality, Non-Solicitation and
> Invention Assignment Agreement or other non-
> competition, non-disclosure or non-
> solicitation agreement in effect with the
> Company; (2) [Mr. Danois's] commission of a
> felony or a crime of moral turpitude; (3)
> [Mr. Danois's] misappropriation or
> embezzlement; (4) [Mr. Danois's] willful
> neglect, insubordination, failure to perform
> assigned duties, or material breach of any
> employment or service agreement between [Mr.
> Danois] and [i3]; or (5) [Mr. Danois's]
> participation in any illegal activity."

Id. The agreement provided that if Mr. Danois wished to exercise this option and require i3 to buy back his shares, he "must send written notice to the Company setting forth [his] intention to sell all of [his] Shares (the 'Put Notice')", and "the closing of the purchase shall take place at the principal offices of the Company on a date specified by the Company, but not later than thirty (30) days following the receipt of the Put Notice." Id.

Mr. Danois executed the Promissory Note, and with unanimous consent of the Board i3 entered into the agreement the Note embodied. Def. Facts ¶¶ 79-80; Unanimous Written Consent, Def. Ex. 33.

According to i3, Mr. Danois exercised some of his stock options and purchased 1,775,964 shares of i3 Common Class A stock. Def. Facts ¶ 81. In support of this contention, the

defendants cite an email from Alex Pearl, a lawyer for i3, asking that the capitalization table i3 used to document ownership of shares in the company be adjusted "to show that as of 1-21-09 Derek exercised 1,775,964 shares of his vested stock options which become shares of Class A Voting Common Stock", Jan. 23, 2009 Letter, Def. Mot. Ex. 34.  The defendants note that "[t]hat same day, i3's finance manager emailed Mr. Pearl, with a carbon copy to Mr. Danois, an updated Cap Table reflecting Mr. Danois's ownership in the shares underlying the Promissory Note", Def. Facts at ¶ 84 (citing Jan. 23, 2009 email from Pearl, Def. Mot. Ex. 35).

On January 23, 2009, i3's shareholders voted to amend the company's Third Amended and Restated Certificate of Incorporation, thereby amending its Articles of Incorporation and Charter.  Def. Facts at ¶ 85; Action by Partial Written Consent, Def. Mot. Ex. 36.  Mr. Danois voted the purchased shares and signed the Consent and Waiver attesting that he had "all requisite power and authority to execute and deliver" consent.  Def. MSJ Ex. 36 at I3-130915.

Regarding the physical transfer of the stock certificate, Mr. Danois argues that he never actually received the stock certificates: "i3 readily admits that it never actually issued the stock certificates to Mr. Danois."  Pl. MSJ

at 7.  In support, Mr. Danois cites the deposition testimony of Mark Turnbull, i3's Board Chairman, in which Turnbull responds to the question, "Do you recall whether Mr. Danois actually was issued a stock that was reflected in the promissory note?" by saying, "I don't.  Mr. Danois was running the company.  I don't know if he issued certificates to himself or not."  Mark Turnbull Dep., Pl. MSJ Ex. G at 83:2-7.  Mr. Danois also cites the defendants' Answer, in which they admit in paragraph eighteen that "stock certificates were not provided to Mr. Danois."  Pl. MSJ at 7, citing Answer ¶ 18.

The defendants counter that Ms. Danois told i3 she had given Mr. Danois the stock certificate.  On February 11, 2009, the employee responsible for ensuring that Mr. Danois receive the stock certificate, Carol Stewart, wrote Mr. Danois an email saying that his Class A common stock certificate was in i3's office.  See Feb. 11, 2009 Email from Carol Stewart, Def. Facts Ex. 37.  She asked Mr. Danois if she should send it to him in Florida or if he could wait until the following week to sign it, and he said that he would wait until the following week.  Id.

On February 26, 2009, Stewart sent Ms. Danois an email saying, "I sent you Derek's stock certificate last week before the board meeting . . . Did that ever get signed by both of you?"  Feb. 26, 2009 Email from Carol Stewart, Def. MSJ Ex. 38.

Ms. Danois replied, "I signed it and gave it to Derek when he was in Philly.  You may want to follow up with him."  Id.

As we mentioned above, in November of 2009 the company began to shut down operations, a process that included laying off almost all of its employees, including Mr. and Ms. Danois, as Turnbull explained in his deposition:

> Q:  . . . do you recall the circumstances under which Mr. Danois' employment was, in fact, terminated in 2009?
>
> A:  Yes.  He came to me with a survival plan for the company and a recommendation that a very short list of people be retained and everyone else be let go, including him and Mrs. Danois.
>
> Q:  And do you recall him presenting that plan to the Board of Directors?
>
> A:  I think he did.  Yeah.
>
> Q:  Did the Board of Directors accept his plan?
>
> A:  Yes.

Turnbull Dep., Pl. MSJ Ex. G at 35:20 – 36:10.  The layoffs went into effect on November 30, 2009.  Nov. 30, 2009 National Digital Media Archive, Inc., Board of Directors Minutes, Pl. MSJ Ex. I at i3-110472.  Under the terms of the Put Option, Mr. Danois thus had ninety days, or until February 27, 2010, to cause i3 to buy back the shares he purchased with the Promissory

Note by sending written notice to the company of his intention to exercise his right.  See Put Option, Comp. Ex. 2.

On December 20, 2009, Mark Brosso, a consultant for i3, provided a capitalization table, updated as of November 30, 2009, with a cover sheet in which he explained, "Attached is the Cap Table at 11-30-09.  We have eliminated the recently terminated employees including Derek & Diane since we believe that nobody will exercise within their 90 day window."  Dec. 20, 2009 Email; Pl. MSJ Ex. E at BROSSO-34.

After she was fired from i3, Ms. Danois remained on the Board of Directors.  Def. Facts PARA 94 (citing Dec. 7, 2009 i3 Board of Directors Minutes, Def. MSJ Ex. 39).  On December 7, 2009, Ms. Danois moved to authorize an adjustment to the terms of Mr. Danois's Promissory Note such that Mr. Danois would not have to start making monthly payments to i3, as required by paragraph 7(d) of the Note, for three years.  Dec. 7, 2009 i3 Board of Directors Minutes, Def. MSJ Ex. 41.  According to the minutes, Ms. Danois made this motion pursuant to an earlier discussion in which "[t]he Board authorized Mark Turnbull to engage in settlement discussions with Derek Danois", and as part of those discussions, the Board agreed that "[w]ith respect to the existing Promissory Note, [Turnbull] may offer up to a three year extension from December 1, 2009 to December 1, 2012."  Id.

The Board then nullified this motion during its December 14, 2009 meeting after learning that Mr. and Ms. Danois had been married.  Dec. 14, 2009 i3 Board of Directors Minutes, Pl. MSJ Ex. I at i3-109898.

On December 17, 2009, Turnbull asked an attorney for i3 to prepare a "collection letter", and in response to a draft he asked, "Does he have the right to return the stock?"  Dec. 17, 2009 Email, Pl. MSJ Ex. I at i3-135064.  That day, i3 sent a letter to Mr. Danois's lawyer demanding that Mr. Danois repay i3 pursuant to paragraph 7(d) -- the Note's provision for repayment upon termination without cause.  Dec. 17, 2009 Letter to Natalie Klyashtorny, Def. MSJ Ex. 46.  On December 31, 2009, Turnbull sent a letter to Mr. Danois, saying: "This letter serves as clarification that your employment with i3 Archive, Inc. was terminated for your gross misconduct."  Dec. 31, 2009 Letter to Derek Danois, Def. MSJ Ex. 48.  On January 31, 2010, Gary Martin, the controller for National Digital Medical Archive, sent Mr. Danois a letter demanding payment pursuant to paragraph 7(c) of the Promissory Note, which governs for cause firings.

In June of 2010, i3 issued Mr. Danois a 1099C form that reflected the cancellation of the non-recourse amount of the Promissory Note -- $165,031.45, plus interest of $4,358.07. Def. Facts, Def. MSJ Ex. 50.  On July 15, 2010, Mr. and Ms.

Danois filed a joint tax return in which they did not claim any cancellation of income for the non-recourse amount of the Promissory Note, as they would be required to do for a cancelled debt unless an exception applied. Danois 2010 Tax Return, Def. MSJ Ex. 51. Mr. Danois instead claimed the exception set forth in 26 U.S.C. § 108(e)(5). Under § 108(e)(5), a reduction of a debt which was incurred in order to purchase property may be treated as a purchase price adjustment, id., and by claiming this exception Mr. Danois thus represented to the IRS that the cancellation of the non-recourse amount was a price reduction for the shares he had purchased.

Mr. Danois spoke with Turnbull about exercising his right to require i3 to repurchase the shares pursuant to the Put Option, but he never informed i3 in writing of this intent, as he explained during his deposition:

> Q: Did you ever give the company notice in the 90-day period following the termination of your employment?
>
> A: I did.
>
> Q: You did?
>
> A: Yes.
>
> Q: And how did you provide such notice to the company?
>
> A: In multiple discussions with Mark Turnbull that the note would need to be dealt with as part of my leaving the

39

company. And he assured me that it would
be.

Q: Did you ever document it in writing?

A: I don't recall doing so, but I know it
was part of several conversations as part of
the November time frame with anticipating me
departing the company.

Q: And what do you recall Mr. Turnbull's
response to you when you would bring that
up?

A: He agreed and that it would be handled.

Danois Dep., Def. MSJ Ex. 1 at 68:18 – 69:16.


B.    Discussion

    The plaintiffs now move for summary judgment on Count

I of the complaint, in which they seek a declaration that the

Note is void for lack of consideration and, in addition, or in

the alternative, a declaration that Mr. Danois's termination was

not for cause within the meaning of the Note or the Put Option,

and on Count I of the counterclaim, in which the defendants

allege that Mr. Danois breached the contract contained in the

Note and the Put Option. The defendants move for summary

judgment on the same counts, and they ask that we order Mr.

Danois to pay the recourse amount of the promissory note, or

$55,010.48, plus accrued interest and the attorneys' fees

incurred in collecting such amounts.

Pennsylvania law governs these claims under the choice of law provision in the Note.

The plaintiffs first argue that the Note is void for lack of consideration. They next argue that i3 prevented Mr. Danois from exercising his right to demand repurchase under the Put Option.

### 1. The Promissory Note Is Not Void for Lack of Consideration

According to plaintiffs, Mr. Danois signed the Note in exchange for consideration in the form of (1) the shares themselves, and (2) i3's commitment in the Put Option to repurchase the shares -- and Mr. Danois received neither. Because the question of whether Mr. Danois actually owned the shares governs his obligations under the Note and the Put Option, we will consider this question first.

The plaintiffs argue that i3 never physically issued Mr. Danois the stock, Pl. MSJ at 8, citing defendants' Answer and Turnbull's deposition testimony. They also contend that i3's capitalization tables did not reflect Mr. Danois's ownership of the stock contemplated in the Note. Pl. MSJ at 8. According to the plaintiffs,

> [T]he capitalization table as of November 30, 2009 does not reflect Mr. Danois's ownership of the shares purportedly secured via the promissory note. Instead, the capitalization table shows Mr. Danois as

41

> owning only 50,000 shares of common stock,
> with rights to execute options for 3,551,721
> additional shares, a figure which presumably
> includes the options allegedly covered under
> the promissory note.

Pl. MSJ at 8 (citing Pl. MSJ Ex. E, BROSSO-35, ln. 12) (emphasis in original).

The defendants counter that Mr. Danois did physically receive the shares, and, even if he did not, physical possession is not necessary to ownership, which Mr. Danois demonstrated in other ways.

With regard to physical possession of the shares, the defendants argue that Mr. Danois received the shares from i3 when Ms. Danois gave them to him, as she said she did in her reply to Carol Stewart's February 26, 2009 email. Def. Resp. at 4. The defendants maintain that "Mr. Danois has **ignored** i3's delivery of the shares underlying the Promissory Note to him immediately upon his execution of the Promissory Note and his subsequent recognition of ownership of these shares." Id. (emphasis/bold in original).

Moreover, the defendants argue that "stock certificates are merely one type of evidence of ownership in those shares." Id. at 3. They contend that "i3 recorded ownership of shares in the company by other means, specifically an Excel spreadsheet dubbed a 'Capitalization Table.'" Id. The

defendants point out that Mr. Danois did not dispute the January 23, 2009 capitalization table reflecting his ownership of the shares. They note that Mark Brosso edited the November 30, 2009 table, and they contend that "[t]his ex post facto editing . . . does not further Mr. Danois's Declaratory Judgment action", id. at 4, because the question is whether consideration was ever received, which the earlier capitalization table, Ms. Danois's statements, and Mr. Danois's behavior show it was.

In arguing that Mr. Danois's behavior shows that he received the stock, the defendants point to the fact that Mr. Danois voted the shares underlying the Promissory Note, Def. Resp. at 4, and that he represented to the IRS that he had purchased the shares. Id.; Def. Facts ¶ 112.

Mr. Danois counters that his treatment of the cancelled portion of the debt on his 2009 taxes was not an acknowledgment of the purchase. He argues that he merely followed the advice of his accountant, who testified that the filing "was not intended an acknowledge an obligation [sic] for this debt, but rather, to treat the 1099 as part of filing Mr. Danois' return such that it would have no net tax impact on him until the dispute . . . could be resolved." Pl. Reply in Supp. at 5 (citing Goldis Dec. ¶ 13).

There is no genuine dispute that Mr. Danois owned the shares underlying the Promissory Note. Most importantly, he demonstrated ownership by voting the shares. Our finding that he owned the shares is bolstered by the January 23, 2009 capitalization table reflecting his ownership and the tax return in which he indicated that the debt in the Promissory Note arose out of the share purchase. We thus find that the Promissory Note is not void for lack of consideration on this ground.

The plaintiffs next argue that "further consideration was the Company's agreement to enter into the Put Option agreement, whereby the Company would be <u>required</u> to repurchase the shares from Mr. Danois at no less than an even trade, provided he was not terminated for 'Cause'". Pl. MSJ at 8 (emphasis in original). This description of the contract fails to reflect the requirement that Mr. Danois inform i3 of his intention to exercise the Put Option in writing. We need not reach the question of whether i3's promise to buy back the shares according to the terms of the Put Option was consideration for the Promissory Note because, as we discuss below, we find that Mr. Danois failed to inform i3 in writing of his intention to sell the shares, and thus he failed to trigger i3's buy-back obligation under the Put Option. Thus, even if the repurchase obligation was consideration for the Promissory

Note, that obligation never arose, and so i3 did not fail to provide that consideration.

### 2. i3 Did Not Prevent Mr. Danois From Exercising His Rights Under the Put Option

It is undisputed that the Put Option, by its terms, required that Mr. Danois notify i3 <u>in writing</u> if he wished to force the company to repurchase his shares: "If you desire to exercise your right to require the Company to purchase your Shares, you must send written notice to the Company setting forth your intention to sell all of your Shares (the 'Put Notice')."  Put Option, Comp. Ex. 2.  It is also undisputed that Mr. Danois did not notify the company in writing of his intention to exercise the option.

Nevertheless, the plaintiffs argue that Mr. Danois's performance under the Note is discharged because i3 prevented him from exercising his option under the Note by wrongfully recharacterizing his layoff as "For Cause".  According to the plaintiffs, "[t]he wrongful reclassification effectively prevented Mr. Danois from exercising the Put Option" and "when one party to a contract unilaterally prevents the performance of a condition by a second party, the culpable party may not then capitalize on that failure to impose liability on the second party."  Pl. MSJ at 10-11.

We must first determine whether the recharacterization was wrongful, and, if it was, whether it prevented Mr. Danois from performing under the Put Option by notifying i3 in writing of his intention to exercise his option.

The plaintiffs argue that the recharacterization was wrongful because under Pennsylvania law, "an employer cannot recharacterize a non-cause separation of service as 'for cause' based on after-acquired evidence." Id. at 10. They cite Pilkington v. CGU Ins. Co., No. 00-2495, 2000 WL 33159253, at *7 (E.D. Pa. Feb. 9, 2001) in support, but Judge Waldman did not address this principle in that case. Pilkington concerned an allegation that the defendant-employer had "knowingly used an unfounded charge of sexual harassment to discharge [plaintiff] and evade its obligation to pay him the accrued bonus money", id.. Judge Waldman, finding that plaintiff was entitled to receive his bonus unless he was terminated for cause, concluded that if the plaintiff could show he was terminated without cause, he could be entitled to receive a bonus. Id. The plaintiffs similarly rely on Pyle v. Meritor Savings Bank, Nos. 92-7362, 92-7362, 1995 WL 695085, at * 2-3 (E.D. Pa. Nov. 21, 1995), where Judge Hutton (again) reached the unremarkable conclusion that a for-cause employee may only be discharged for cause.

In fact, courts have found that under Pennsylvania law after-acquired evidence may affect the status of an employee's termination.  In <u>Dobinsky v. Crompton & Knowles Colors Inc.</u>, No. 3:02cv1291, 2004 WL 2303686, at *5 (M.D. Pa. Mar. 30, 2004), Judge Munley found that the Pennsylvania courts would ascribe to the "after-acquired evidence doctrine" that states that "if an employer can demonstrate that it would have fired an employee, had it known of prior misconduct, then the employee's claim for breach of contract is barred, or put differently, the prior misconduct excuses the employer's breach."  <u>Id.</u>  <u>Dobinsky</u> remains undisturbed and indeed courts in our district have twice applied its rule.  <u>See</u> <u>Loftis v. Key Energy Services, Inc.</u>, No. 07-2871, 2008 WL 2609918, at * 3 (E.D. Pa. June 26, 2008); <u>Ferarolis v. Int'l Recovery Systems, Inc.</u>, No. 04-5080, 2006 WL 6853174, at *1 (E.D. Pa. Feb. 2, 2006).  In <u>Loftis</u>, Judge Kauffman extended <u>Dobinsky</u>'s holding to allow employers to use after-acquired evidence offensively to support their own breach of contract claims, reasoning that

> [T]he contract principles upon which [<u>Dobinsky</u>] relied are equally applicable in the context of Defendant's counterclaims, and it follows that if Defendant can use after-acquired evidence to defend against a breach of contract claim, it should have the opportunity to utilize after-acquired evidence to prove its own claim that Plaintiff breached his employment contract.

Loftis, 2008 WL 2609918, at *3.

Whether Mr. Danois's behavior in fact warranted a for-cause termination involves a question of fact, and, as such, is a question for a jury, see Ott v. Buehler Lumber Co., 541 A.2d 1143, 1145 (Pa. Super. 1988) ("where the evidence to sustain the justification for discharge is disputed, the jury must pass on it") (citing Bernstein v. Lipper Mfg. Co., 160 A. 770 (Pa. 1932)), but we do not find i3's recharacterization wrongful based on the plaintiffs' argument that i3 relied on after-acquired evidence.

We thus turn to the question of whether the recharacterization prevented Mr. Danois from notifying i3 in writing of his intent to sell back his shares. In support of the argument that it did so prevent him, the plaintiffs cite Scully v. US WATS, Inc., 238 F.3d 497 (3d Cir. 2001). In Scully, the defendant-employer -- US WATS -- prevented an employee from exercising his stock options by firing him before his two-year employment contract expired. Id. at 503; Pl. MSJ at 11. US WATS maintained that in order to exercise the stock options Scully had to be employed with the company, Scully, 238 F.3d at 503, and, by firing him, the company made it impossible for Scully to exercise the options:

> [US WATS] carried out [its] plan to (1)
> replace plaintiff before the end of 1996,
> (2) persuade him that he would remain in the

48

company's employ through May 1997, and would
therefore see no need to take immediate
action with respect to exercising his
options, and (3) fire him as of December 30,
1996, without advance notice, so that he
would be unable to exercise his options
before the termination of his employment.

Id. at 504 (quoting Scully v. US WATS, Inc., No. 97-4051, 1999
WL 553474, at *1 (E.D. Pa. July 29, 1999)).

The impossibility Scully faced hardly resembles Mr.
Danois's situation here.  Mr. Danois did not have to be employed
with i3 to send a written demand under the Put Option -- indeed,
the need to send such a demand arose only in the event that Mr.
Danois was fired.

The plaintiffs argue that "by notifying Mr. Danois,
within the election period of the Put Option that, in fact, it
was denying Mr. Danois the right to exercise the option, it
unfairly seeks to capitalize on that 'failure' to require Mr.
Danois to pay under the promissory note."  Pl. MSJ at 11.  This
argument fails.  Mr. Danois has not shown that i3's
recharacterization prevented him from informing i3 in writing of
his intent to exercise, as the Put Option requires.

Thus, although the plaintiffs argue conclusorily that
"when one party to a contract unilaterally prevents the
performance of a condition by a second party, the culpable party
may not then capitalize on that failure to impose liability on

the second party", id., they do not demonstrate that i3
prevented Mr. Danois from notifying the company in writing of
his intent to exercise his option to sell back the shares.

The defendants argue that because Mr. Danois never
submitted written notice of his intent to exercise the Put
Option, he voluntarily waived his right to exercise it.  We
agree.  The recharacterization of Mr. Danois's termination as
for cause did not prevent Mr. Danois from informing i3 in
writing of his intent to exercise the Put Option, as the
contract required him to do if he wished to exercise that
option.

### 3.   The Frustration of Purpose Doctrine Does Not Discharge Mr. Danois's Performance Obligations

The plaintiffs next argue that Mr. Danois's
performance under the Promissory Note is discharged pursuant to
the frustration of purpose doctrine.  Pl. MSJ at 11.  The
plaintiffs quote the Restatement (Second) of Contracts § 265
(1979) for the proposition that "Where, after a contract is
made, a party's principal purpose is substantially frustrated
without his fault by the occurrence of an event the non-
occurrence of which was a basic assumption on which the contract
was made, his remaining duties to render performance are
discharged . . . ."  Id. (citing Kroblin Refrigerated Xpress,

Inc. v. Pitterich, 805 F.2d 96 (3d Cir. 1986)).  According to
the plaintiffs, "Mr. Danois was frustrated in his ability to
resell the shares based on his assumption that i3 would honor
the characterization of his termination as not for 'Cause.'".
Id..

In Kroblin Refrigerated, the party arguing frustration
of purpose pointed to a change in federal regulations which
affected the parties' behavior under the contract.  Here, Mr.
Danois entered into a contract which included provisions for
termination for cause and without cause.  See Promissory Note,
Comp. Ex. 1 at ¶ 7(c) and (d).  Mr. Danois cannot argue that the
occurrence of one of the events contemplated in the contract
amounts to a frustration of purpose.

We thus find that Mr. Danois is not entitled to
summary judgment on Count I of the complaint or Count I of
defendants' counterclaim.

> 4.  The Defendants Are Entitled to Partial
>     Summary Judgment on the Breach of Contract Claim

We turn to the defendants' argument that they are
entitled to summary judgment on these claims.  The defendants
argue that because Mr. Danois did not inform i3 of his intent to
sell back the shares, nor did he make repayments according to
the terms contained in ¶ 7(c) or (d), he breached the Promissory

Note.  Def. MSJ at 4.  Mr. Danois does not dispute that he executed the Promissory Note, nor does he dispute that he neither informed i3 in writing of his intention to resell the shares back to i3 nor made any repayments on the Note.

The defendants further argue that Mr. Danois has no valid defense to the breach of contract claim.  We rejected above Mr. Danois's defenses to the breach of contract claim -- that the contract was void for lack of consideration, that i3 prevented Mr. Danois from informing the company of his intention to resell, or that he is excused under the frustration of purpose doctrine -- and so we agree that he does not have a valid defense to his non-compliance.

We thus find that there is no genuine issue of material fact as to whether Mr. Danois breached the contract and whether he has a valid defense to that breach, and we will grant the defendants summary judgment on Count I of the Counterclaim -- the breach of contract claim regarding Mr. Danois's breach of the Promissory Note.  With regard to Count I of the Complaint, we find that the Promissory Note is not void for lack of consideration.  In that count, the plaintiffs also seek a declaration that "Mr. Danois's termination was not for 'cause' within the meaning of the Promissory Note and the Put Option." Comp. ¶ 27.  Except to the extent that the plaintiffs argued

that a for-cause firing could not be based on after-acquired evidence -- which we rejected -- the parties have not briefed this question.  As we find that genuine issues of fact exist with regard to this claim, we will not grant summary judgment to either party on this count.

This finding affects our determination of damages. The defendants argue that "i3's damages are obvious" in that "Mr. Danois has deprived i3 of its contractual right to payment of the recourse portion of the Promissory Note's principal, $55,010.48."  Def. MSJ at 6.  But the Promissory Note provides for different repayment schedules depending on whether or not the firing is for cause.  If it is for cause, the Note provides that Mr. Danois "shall be required to pay in a lump sum within ten (10) days of such resignation or termination of employment or service . . . the principal balance due under this Note and accrued interest thereon."  Promissory Note, Comp. Ex. 1 at ¶ 7(c).  If the termination is not for cause, Mr. Danois "shall be required to pay in equal monthly installments, commencing within ten (10) days following the date of such termination of employment or service, the principal balance due under this Note and accrued interest thereon."  Id. at ¶ 7(d) (emphasis added). The nature of the firing, now indeterminate, will thus affect

the amount that Mr. Danois owes i3 -- both in terms of principal and interest -- and thus we cannot now ascertain damages.

## V.   Plaintiffs' Wage Claims

We turn now to the parties' cross-motions for summary judgment on Count II of the Complaint in which the plaintiffs assert a claim for wages under the Pennsylvania Wage Payment and Collection Law (WPCL), 43 P.S. § 260.2(a) et seq.

### A.   Facts

i3 paid its employees twice a month.  Turnbull Dep. at 71:19-21.  All employees i3 laid off at the end of November of 2009 -- except for Mr. and Ms. Danois -- were paid their accrued salaries and paid time off.  Id. at 72:23 - 73:12.  Turnbull, Terker, and Joe Keller together decided not to pay Mr. and Ms. Danois.  Id. at 73:15 - 74:12.  According to i3's records regarding Mr. and Ms. Danois's weekly pay rates and their accrued paid time off, if they received salaries for the last two weeks of November of that year as well as paid time off, Mr. Danois would receive $14,115.08 and Ms. Danois would receive $13,299.86.  Pl. MSJ at 13.

### B.   Discussion

In their motion for summary judgment, the plaintiffs argue that the defendants do not deny paying them for their last

two weeks of employment or their accrued paid time off, Pl. MSJ at 12-13, and they contend that the defenses i3 raises fail. Id. at 13. i3's defenses that plaintiffs identify are that (1) the Danoises owe i3 more money in unliquidated damages than i3 owes to them in unpaid wages -- which plaintiffs contend fails because the WPCL does not allow for this kind of off-setting, id. at 13-14 -- and (2) the Danoises are not entitled to payment because they failed to perform services during their final weeks of employment. Id. at 14. Plaintiffs argue that the second defense fails for three reasons: (1) even if they did not perform in the last two weeks, this would not justify withholding payment for accrued paid time off; (2) even if the defendants question the value of the services the Danoises provided in their last two weeks at i3, they may not engage in self-help by refusing to pay their salaries; and (3) the defendants have no factual basis for the conclusion that the Danoises failed to perform in their final weeks of employment. Id. at 14-16.

In the defendants' motion for summary judgment on this claim, they argue that the Danoises forfeited their right to wages based on their breaches of fiduciary duties to i3. Def. MSJ at 17. They contend that under the "faithless servant" doctrine, "an employee forfeits 'compensation for conduct which

is disobedient or which is a breach of duty of loyalty' and must disgorge compensation for a 'serious violation of a duty of loyalty or seriously disobedient conduct[.]'" Def. Resp. at 9-10 (quoting Fidelity Fund, Inc. v. Di Santo, 500 A.2d 431, 440 (Pa. Super. Ct. 1985)).

As the Pennsylvania courts have made clear, the WPCL "does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement", Banks Engineering Co. v. Polons, 697 A.2d 1020, 1024 (Pa. Super. 1997). Thus, if there is a genuine issue of material fact as to whether the Danoises were "otherwise entitled" to the compensation they seek, we may not grant summary judgment on this claim.

The defendants note that "[n]o Pennsylvania case has discussed the right to recover wages under the WPCL where the employer asserts that the employee forfeited their right to compensation by breaching his or her fiduciary duty of loyalty", Def. MSJ at 16, but they argue that Fidelity Fund should inform our analysis here. In Fidelity Fund the Pennsylvania Superior Court cited the Restatement (Second) of Agency § 469 for the proposition that "[a]n agent is entitled to no compensation for

conduct which is disobedient or which is a breach of duty of loyalty, if such conduct constitutes a wilful and deliberate breach of his contract of service", <u>Fidelity Fund</u>, 500 A.2d at 439, and the court found that an insurance salesman was not entitled to receive commissions for sales which constituted a breach of his fiduciary duty.

The defendants also cite <u>Futch v. McAllister Towing of Georgetown, Inc.</u>, 518 S.E.2d 591 (S.C. 1999), in which the Supreme Court of South Carolina found that "an employee who breaches the common law duty of loyalty to an employer . . . forfeits the right to compensation". <u>Id.</u> at 605. The South Carolina high court recognized that this principle could bar an employee from collecting wages under that state's Payment of Wages Act. <u>Id.</u>

Because the WPCL does not establish a substantive right to wages, and because under Pennsylvania law an employee is not entitled to recover wages for conduct that constitutes a breach of the duty of loyalty, whether the Danoises may recover depends on whether they breached their duty of loyalty -- a determination which, as we explained above, requires the resolution of issues of material fact still in dispute. We will therefore deny both parties summary judgment on this claim.[6]

---

[6] We note that unlike the breach of fiduciary duty in <u>Fidelity Fund</u>, the alleged breach of fiduciary duty here is not

VI.  Plaintiffs' Motion for Summary
     Judgment on Their COBRA Claim

     The plaintiffs move for summary judgment on Count III

of their Complaint in which they seek equitable relief under 29

U.S.C.  § 1132(a)(3) -- § 502(a)(3) of the Employee Retirement

Income Security Act of 1974 (ERISA) -- to compensate them for

health insurance premiums they paid after Turnbull erroneously

determined that they were not entitled to health coverage under

COBRA.  Pl. MSJ at 17.

     A.   Facts

          On December 31, 2009, Turnbull sent Mr. Danois a

letter characterizing the reason for his termination as "gross

misconduct" and concluding that Mr. Danois was not entitled to

coverage under COBRA.  Pl. MSJ Ex. H.  On January 19, 2010,

Carol Stewart, an i3 representative, informed the company's

insurance representative that Ms. Danois was also not eligible

for COBRA coverage because she had been terminated for "gross

misconduct."  Pl. MSJ Ex. E at BROSSO-168-170.

          The plaintiffs aver, and the defendants do not

dispute, that on February 24, 2010, the Department of Labor

(DOL) ruled that the Danoises had not been terminated for

---

transaction-specific.  When we determine damages, we will
welcome briefing on how any period in which the Danoises may be
found to have breached their fiduciary duty affects defendants'
recovery.

willful misconduct within the meaning of COBRA and required i3 to reinstate their benefits.  See Pl. MSJ at 18; Def. Response at 10.

The plaintiffs further aver, and defendants again do not dispute, that when i3 denied the Danoises coverage the American Recovery and Reinvestment Act of 2009 ("ARRA") subsidized separated employees' COBRA premiums such that employees paid only thirty-five percent of the premiums for up to fifteen months.  Pl. MSJ at 18.  Before the DOL reinstated the Danoises' coverage, Mr. Danois paid a full, unsubsidized premium to his ex-wife's healthcare provider in order to secure insurance for his children.  When the DOL reinstated coverage, Mr. Danois had to pay for the i3 COBRA coverage retroactively from December 1, 2009.  Comp. ¶¶ 46-47.

B.  Discussion

The plaintiffs seek equitable relief under 29 U.S.C. § 1132(a)(3) as well as $110 per day in penalties pursuant to 29 U.S.C. § 1132(c)(1) based on i3's failure to properly provide notice of the Danoises' COBRA rights and "proper" relief in the form of reimbursement for the cost of the three months of premiums that Mr. Danois paid under his ex-wife's health policy.  Pl. MSJ at 18.  The request for penalties is based on the argument that although i3 initially informed the Danoises of

their right to COBRA coverage, the company effectively withdrew this notice through its December 31, 2009 letter. Id. at 18 n.15.

The defendants counter that the remedy plaintiffs seek under § 1132(a)(3) is not appropriate under the statute. Def. Resp. at 10. They argue that claims for the equitable relief contemplated in § 1132(a)(3) are subject to equitable defenses, and that here the doctrines of unjust enrichment, unclean hands and equitable forfeiture counsel against the damage award. Def. Resp. at 10-12. With regard to the plaintiffs' claim under § 1132(c)(1), the defendants argue that the Complaint states a claim only under § 1132(a)(3), which does not allow for punitive damages.

We agree that Count III of the Complaint states a claim only for a violation of § 1132(a)(3) and not for a violation of the notice provisions contemplated in § 1132(c)(1), and under Mertens v. Hewitt Associates, 508 U.S. 248, 256 (1993), § 502(a)(3) authorizes relief of the kinds "typically available in equity", which do not include punitive damages. We will not grant the plaintiffs the relief they seek in the form of penalties and reimbursement under § 1132(c)(1). Instead, we turn to the plaintiffs' claim for equitable relief under § 1132(a)(3), or § 502(a)(3) of ERISA.

Section 1132(a)(3) provides that an ERISA plan participant may bring an action "to obtain other appropriate equitable relief (i) to redress such violations [of any ERISA provision or the terms of the plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan." Here, plaintiffs' motion for summary judgment fails because they have not shown that the defendants violated any provision of ERISA or of the plan. To the extent that plaintiffs argue that i3, as a fiduciary, violated ERISA or the terms of the plan by erroneously classifying them as having been terminated for gross misconduct, they have not identified which ERISA provision or plan term this violates. It appears that to the extent the determination was erroneous, the DOL corrected that mistake within its ERISA review procedure. The plaintiffs have thus failed to meet their burden under Celotex of demonstrating that there is no genuine issue of material fact that the defendants' conduct violated a provision of ERISA or of the plan.

VII. Plaintiffs' Motion for Summary Judgment on Defendants' Pennsylvania Uniform Trade Secrets Act Counterclaim

The plaintiffs move for summary judgment on the defendants' Pennsylvania Uniform Trade Secrets Act ("PUTSA") counterclaim -- Counterclaim Count III. PUTSA, 12 Pa. Cons. Stat. Ann. §§ 5303-4, creates a cause of action for the actual

loss caused by misappropriation of trade secrets and the unjust enrichment caused by such misappropriation.  Under <u>Bimbo Bakeries USA Inc. v. Botticella</u>, 613 F.3d 102 (3d Cir. 2010), a defendant has misappropriated trade secrets if he has "acquired knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent."  <u>Id.</u> at 110.  According to plaintiffs, "there is simply <u>no</u> evidence that Mr. Danois has disclosed or used any trade secrets without i3's consent."  Pls. MSJ at 19-20 (emphasis added).

A.    <u>Facts</u>

In October of 2009, Accenture, Mr. Danois's current employer, contacted him to offer him a position as a Senior Executive.  Def. Resp. at 14; Derek Dep., Def. Resp. Ex. 53, at 185:21 - 186:5; 190:3 - 22.  Mr. Danois did not tell anyone on the i3 Board about this position.  <u>Id.</u> at 186:22 - 187:3.

In response to Accenture's request for an employment reference from i3, Mr. Danois directed Accenture to Teri Black, a Human Resources consultant for i3.  Nov. 5, 2009 Email from Neil Sim to Teri Black, Def. Resp. Ex. 55; Derek Dep. 188:12 - 189:8.

The parties do not dispute that in November of 2009, Mr. Danois received a hard drive containing i3's Board minutes

and vendor contracts.  See Pl. MSJ at 20; Counterclaims ¶¶ 96-100.  See also Mark Brosso Declaration, Pl. MSJ Ex. E ¶ 5 ("It is further my understanding that Mr. Danois had an image of his computer hard drive sent to him by someone at i3 at sometime in late November, 2009 for the purpose of facilitating his work as a consultant to i3").

The plaintiffs maintain that the drive failed and the data were unusable, citing Mr. Danois's own deposition testimony on this point.  Pl. MSJ at 20 (citing Derek Dep., Ex. A, at 225-227).  In that deposition, Mr. Danois testified:

> A:  . . . That drive failed at some point in time.  So I think -- you know, I think it was one of the items requested, but I think I communicated I didn't have the drive, so . . .
>
> Q:  Well, you said failed, so --
>
> A:  The hard drive inside failed.  It was not readable.  It wouldn't be recognized. So I think it was discarded.
>
> Q:  When you say "it was discarded," did you discard it?
>
> A:  I discarded it, yeah . . . .
>
> Q:  Did you tell anyone when you got it, oh, this doesn't work?
>
> A:  No.  It would work for some period of time.  But at -- I don't know, maybe after just copying everything over it was, you know, not really functioning very well so it was probably discarded.  It wasn't unusual because we had drives like that failing

constantly, so it didn't stand out in my
                    mind as being unusual.

Derek Dep., Pls. MSJ Ex. A at 228:14 - 229:14.

        The parties agree that Mr. Danois did not return the

hard drive to i3 after he was fired.  Derek Dep., Pl. MSJ Ex. A

at 228:12 - 14; Def. Resp. at 15.

        According to his profile on "LinkedIn", a social

networking Web site, Mr. Danois began working for Accenture as

Managing Director for Medical Imaging Services in January of

2010.  See Derek Danois Profile, Def. Resp. Ex. 57.  On March

17, 2010, Mr. Danois gave a presentation at a conference in

Barcelona, Spain on "Medical Imaging, Achievements and

Challenges" concerning the development of a medical imaging

network.  See World of Health IT 2010 Conference and Exhibition

Materials, Def. Resp. Ex. 58.

        The plaintiffs claim that Brosso declared that i3's

internal investigation of Mr. Danois's activities with Accenture

"did not produce information indicating that Mr. Danois had

misappropriated any trade secrets of i3 or that he had violated

the terms of his non-compete agreement", Pls. MSJ at 22 (citing

Brosso Decl. at ¶ 8, Exhibit E), but they do not include this

paragraph of Brosso's Declaration in the exhibits to their

motion.  Instead, Brosso's Declaration, contained in Exhibit E

                              64

to the plaintiffs' summary judgment motion, ends after the fifth paragraph.

B.    Discussion

As our Court of Appeals has explained, the Pennsylvania courts have adopted the Restatement of Torts § 757 definition of a trade secret: "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." SI Handling Systems, Inc., 753 F.2d at 1255 (quoting Restatement of Torts § 757 comment b. (1939)).  The factors courts consider in determining whether an item of information is a trade secret are:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. at 1256.

As we noted above, misappropriation under Pennsylvania law consists of "acquir[ing] knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then disclos[ing] or us[ing] that trade secret without the other's consent."  Bimbo Bakeries, 613 F.3d at 110.

In their effort to demonstrate a genuine issue of material fact, the defendants point out that Mr. Danois received a job offer from Accenture -- a firm that, like i3, was working to develop a medical imaging network -- which he did not disclose to other Board members.  After receiving the job offer, Mr. Danois received a hard drive from i3 containing all of i3's board minutes and contractual agreements with vendors.  Although Mr. Danois claims the hard drive did not work, his own deposition testimony is the only evidence supporting that claim, and it is undisputed that Mr. Danois did not return the hard drive to i3.  Def. Resp. at 14 - 16.

The plaintiffs argue that the defendants have not identified which information on the hard drive constituted a trade secret, such that they have not created a genuine issue as to one of the predicates for misappropriation.  Pls. Reply at 8. We agree.  Even if Mr. Danois did have access to the information on the hard drive, that information consisted of the vendor

lists and i3's Board meeting minutes.  i3 has access to this information, and unlike the parties asserting misappropriation in Bimbo Bakeries and SI Handling, Inc., the company has not identified a single specific piece of information which constitutes a trade secret or explained why the information in the aggregate constitutes a trade secret.  Compare Bimbo Bakeries, 613 F.3d at 105 (plaintiff argued that the trade secrets to which defendant had access included "code books containing the formulas and process parameters for all of Bimbo's products" and "the knowledge necessary to replicate independently Bimbo's popular line of Thomas' English Muffins, including the secret behind the muffins' unique 'nooks and crannies' texture"); SI Handling Systems, Inc., 753 F.2d at 1256 (upholding the district court's finding that the pieces of information constituting trade secrets included SI's method of examining drive tubes for concentricity; the dimensions, tolerances, and method of fit between drive tubes and drive plugs; and the use of a nonstandard maximum angular misalignment in conjunction with certain grease pack specifications in bearings).

Here, the defendants have not identified any information Mr. Danois has which constitutes a trade secret, and, as such, they have not designated a specific fact showing a

genuine issue for trial on their trade secret claim.  We will

thus grant plaintiffs' motion for summary judgment on this

claim.

The plaintiffs also move for attorney fees and costs

incurred in defending the claim.  Under the PUTSA, we may award

such fees "if a claim of misappropriation is made in bad faith."

12 Pa. Cons. Stat. Ann. § 5305.  As Judge Standish pointed out

in Hill v. Best Medical Int'l, Inc., Nos. 07-1709, 08-1404, 09-

1194, 2011 WL 6749036 (W.D. Pa. Dec. 22, 2011), "no reported

Pennsylvania case has discussed this specific issue and the term

'bad faith' is not defined in the PUTSA."  Id. at *3.  Judge

Standish reasoned that the Third Circuit has found "indications

of bad faith [to] include evidence that the claims advanced were

meritless or that the motive for filing the suit was for an

improper purpose such as harassment."  Id.  Here, we do not find

evidence that the claim was brought in bad faith.  Though the

defendants have not produced evidence that the information Mr.

Danois had constituted trade secrets, the situation in which a

high-level employee leaves one company to work for a competitor

often gives rise to valid trade secret claims, and the claim

here was not clearly meritless.  We will thus deny the

plaintiffs' request for attorney fees and costs incurred in

defending this claim.

VIII. Plaintiffs' Motion For Summary Judgment On
Defendants' Computer Fraud And Abuse Act Counterclaim

We turn finally to the plaintiffs' motion for summary judgment on the defendants' counterclaim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 -- Count VI of the Counterclaim. The defendants assert this Count under § 1030(a)(5)(A), which imposes liability on one who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." Section 1030(g) creates a private right of action under the CFAA, and it provides that "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." See also P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, 428 F.3d 504, 512 (3d Cir. 2005). Section 1030(c)(4)(A)(i)(I) allows for a private cause of action if the conduct involves "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value . . . .".

In the counterclaim, the defendants allege that Mr. Danois is liable because "after the termination of his employment, Mr. Danois accessed i3's email system and deleted emails from his own and from Mrs. Danois's company email accounts", and he "deleted data files from the first HP Z800

69

computer prior to returning it to i3."  Def. Counterclaim at ¶¶
165-66.

A.    Facts

Robert Marino, i3's systems engineer, testified that
after Mr. Danois was fired Marino noticed that the volume of
email in his mailbox had decreased significantly, suggesting
that Mr. Danois had deleted several emails.  Marino Dep., Pl.
MSJ Ex. N, at 36:6 - 14.  Marino testified that he was able
restore all the emails that "resided in the deleted cache area"
for Mr. and Mrs. Danoises' accounts, id. at 37:6 - 8, which
returned the accounts' volumes to "pretty close" to their
typical size, suggesting that most of the emails had been
recovered.  Id. at 38:21 - 39:1.

Because the defendants point to no facts relevant to
the purported deletion of data files from the first HP Z800
computer in defending against the motion for summary judgment,
see Def. Resp. at 18-19, we do not consider the facts related to
that activity here.

B.    Discussion

The plaintiffs move for summary judgment on this claim
on the ground that "i3 has not even pled, nonetheless [sic]
demonstrated, [the $5,000] predicate loss."  Pl. MSJ at 24.

According to the plaintiffs, "i3's system engineer, Robert Marino, has conceded that Mr. Danois caused no actual damage through any deletion of e-mails based on Mr. Danois's allegedly unauthorized access on December 1, 2002, as he almost immediately recovered <u>all</u> of the allegedly deleted e-mails." <u>Id.</u> at 23 (emphasis in original), and "Mr. Marino testified unequivocally that although Mr. Danois had reinstalled the operating system on the Z800 computer, the forensic company it hired, Capsicum, was able to reinstate everything that had been deleted from the computer." <u>Id.</u> at 24.

The defendants do not address the Z800 computer, but with regard to the damages based on Mr. Danois's email deletion, they argue that the process of restoring the emails "took two full days and prevented [Marino] from furthering the business of i3 at a critical juncture in its history." Defs. Resp. at 18. The defendants fail to point to any evidence that this effort cost more than $5,000, and so they have failed to demonstrate a genuine issue of fact that they have established a predicate for a private right of action under § 1030(g).[7] We will thus grant the plaintiffs' summary judgment motion on this counterclaim.

---

[7] Though the predicates under 1030(g) also include subclauses (II), (III), (IV), and (V) to § 1030(c)(4)(A)(i), the defendants do not argue that any of these predicates apply, instead relying on subclause (I) of subsection (c)(4)(A)(i). See Defs. Resp. at 17.

IV.  Conclusion

     For the foregoing reasons, we will grant defendants' motion for summary judgment on Count I of the Counterclaim and we will grant the plaintiffs' motion for summary judgment on Counts III and VI of the Counterclaim.

     We will deny both parties' motions for summary judgment on Counts I and II of the Complaint, we will deny the plaintiffs' motion for summary judgment on Count III of the Complaint and Count I of the Counterclaim, and we will deny the defendants' motion for summary judgment on Count V of the Counterclaim.

BY THE COURT:

/S/ STEWART DALZELL, J.