## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEREK DANOIS and DIANE DANOIS, h/w** | : | **CIVIL ACTION** |
| *Plaintiffs* | : | **NO. 11-3856** |
| | : | |
| **v.** | : | |
| | : | |
| **i3 ARCHIVE, INC., MARK TURNBULL, JOSEPH KELLER, and BRUCE E. TERKER** | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    JANUARY 12, 2015

# MEMORANDUM OPINION

## INTRODUCTION

Presently before this Court is *a motion seeking to enforce a settlement agreement* filed by Defendants i3 Archive, Inc., Mark Turnbull, Joseph Keller, and Bruce E. Terker (collectively, "Defendants"), against Derek Danois and Diane Danois ("Plaintiffs"). [ECF 58]. Plaintiffs oppose the motion, [ECF 60], and Defendants have filed a reply to Plaintiffs' opposition. [ECF 61].

On December 15, 2014, this Court held an evidentiary hearing and also entertained oral argument on the motion. The issue has been fully briefed, and for the reasons stated herein, Defendants' motion to enforce the settlement agreement is granted.

## BACKGROUND / FINDINGS OF FACT

On June 13, 2011, Plaintiffs initiated a declaratory judgment action arising out of the termination of their employment with Defendants. [ECF 1]. Defendants responded to the complaint and filed a counterclaim. [ECF 5]. Discovery ensued and was completed. Thereafter, the parties each filed dispositive motions. By Order dated July 12, 2013, the Honorable Stewart

Dalzell granted, in part, and denied, in part, the parties' respective motions for partial summary

judgment. [ECF 42]. The matter later was referred to United States Magistrate Judge Jacob P.

Hart for settlement. Accompanying his Order, Judge Dalzell issued a very lengthy and thorough

Memorandum Opinion, which this Court has relied on, in part, for the following findings of

facts:

>    Defendant i3 Archive, Inc. ("i3"), was established to provide clinical
> intelligence and performance management solutions for the diagnostic imaging
> sector of the healthcare industry.[1, 2] Messieurs Turnbull, Keller, and Terker served
> on i3's Board of Directors and, individually and/or through the investment firms
> they managed, contributed significant capital to i3.

>    Prior to the separation of Derek Danois ("Mr. Danois") from the company,
> he was employed as i3's Chief Executive Officer and was also a Board member.[3]

>    Diane Danois ("Mrs. Danois"), then single and known by her maiden
> name Diane Hockstein, was employed as i3's Executive Vice President of
> Business Development and was also a board member.[4] Despite an employment
> agreement that obliged her to devote exclusive time and efforts to i3, for several
> months in 2008 and 2009, Mrs. Danois, an attorney and member of the
> Pennsylvania bar, performed outside work for a law firm and was compensated as
> a W-2 employee.[5]

>    The Danoises married on July 3, 2008.[6] In their role as Board members,
> the Danoises repeatedly voted to increase and approve each other's
> compensation.[7]

>    On November 30, 2009, i3 terminated the employment of 13 employees,
> including the Danoises.[8] Sometime between December 7 and December 14, 2009,
> the other members of i3's Board learned that the Danoises were married to each
> other. Defendant i3 thereafter denied the Danoises any further compensation,

---

[1] July 12, 2013, Mem Opn 1.

[2] The entity of i3 no longer exists and, currently, there is a liquidating trust handling its liabilities. Terker
N.T. 29.

[3] July 12, 2013, Mem Opn 2.

[4] *Id.*

[5] *Id.* at 15.

[6] *Id.* at 2.

[7] *Id.* at 12.

[8] *Id.* at 3.

given the purported breach of their fiduciary duties to disclose their personal relationship and marriage to each other.[9]

Procedurally:

On June 13, 2011, the Danoises filed a declaratory judgment complaint against Defendants alleging violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. §260.2(a), *et seq*., and the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. §1132(a)(3).[10]

On August 15, 2011, Defendants filed an answer to the complaint with affirmative defenses and a nine-count counterclaim alleging that: Mr. Danois breached a promissory note; Mrs. Danois breached her employment contract; Mr. Danois violated the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. §5301, *et seq*.; Mr. Danois converted i3's property; the Danoises breached their fiduciary duties to i3; Mr. Danois violated the Computer Fraud and Abuse Act, 18 U.S.C. §1030(a)(5)(A); the Danoises wasted corporate assets; the Danoises were unjustly enriched; and the Danoises engaged in civil conspiracy to breach their fiduciary duties and commit corporate waste of i3's assets.[11]

By Order and Memorandum Opinion dated July 12, 2013, Judge Dalzell ruled on the parties' respective motions for partial summary judgment finding, in pertinent part, *inter alia*, that Mr. Danois was obligated to pay Defendants recourse of $55,010.48 plus accrued interest and attorney fees for breach of the promissory note, the payment schedule of which was to be determined at trial;[12] and that questions of material fact existed as to whether the Danoises breached their fiduciary duties.[13, 14]

On July 19, 2013, this matter was referred to Magistrate Judge Hart for settlement.[15]

On July 22, 2013, this matter was transferred to this Court's docket.[16] Magistrate Judge Hart continued to oversee the settlement discussions which spanned several months.

On July 17, 2014, Defendants filed the instant motion to enforce a settlement agreement.[17] Plaintiffs dispute that a settlement occurred.

---

[9] July 12, 2013, Mem Opn 3.
[10] ECF 1.
[11] ECF 5.
[12] July 12, 2013, Opn 53.
[13] *Id*. at 16-30.
[14] ECF 41.
[15] ECF 43.
[16] ECF 45.
[17] ECF 58.

As elicited from the evidentiary hearing in which Magistrate Judge Hart testified as one of several witnesses, the following are additional findings of fact regarding the settlement discussions held before Magistrate Judge Hart; *to wit*:[18]

On September 25, 2013, all parties and counsel convened before Magistrate Judge Hart for a settlement conference, wherein a six-figure settlement amount and a request for certain admissions were discussed, but no settlement agreement was reached.[19] The parties did agree, however, that the Danoises would provide a full financial disclosure reflecting their financial situation.[20]

On October 30, 2013, the parties, with the exception of Mrs. Danois for whom Mr. Danois had authority to speak, and counsel met with Magistrate Judge Hart.[21] At the conclusion of the settlement discussions, Magistrate Judge Hart memorialized the terms of the settlement agreement by writing, as part of his personal notes: "*Deal*," and outlined the essential terms of the agreement as follows:[22] "$25,000 within 30 days of signed settlement agreement. $25,000 by March 31, 2014. $25,000 by June 30, 2014. 10-year note at $3,000 per month plus three percent interest (total $360,000 plus interest), first payment due December 1, 2013."[23, 24]

Magistrate Judge Hart also memorialized that "*Written admissions*" (hereinafter "Admissions") were also part of the settlement agreement. These admissions included that:[25] (1) the Danoises concealed their relationship; (2) the Danoises concealed their marriage; (3) Mrs. Danois breached her contract by working for a law firm; (4) Mr. Danois knew of her law firm and did not notify the Board; (5) as Board members the Danoises voted on each other's compensation; (6) Mr. Danois stole a server; and (7) the Danoises repeatedly made representations to the Board which they knew were overly optimistic.[26]

Magistrate Judge Hart suggested a payment schedule to accommodate the fact that the Danoises' financial position was "negative" and that Mr. Danois was

---

[18] *See* Federal Rule of Civil Procedure 52.

[19] Danois N.T. 56; Hart N.T. 5.

[20] Terker N.T. 74.

[21] Hart N.T. 6.

[22] *Id.*; *see also* D-1.

[23] Hart N.T. 7.

[24] Defendants in their brief indicate that the precise amount that the Danoises are to pay is subject to a confidentiality provision. *See* Dfts' Brief 2 n. 2. However, no one objected at the evidentiary hearing to Magistrate Judge Hart's recitation of the monetary portion of the settlement agreement, preserved on the record.

[25] Hart N.T. 7.

[26] *Id.* at 7-8.

unemployed at the time.[27] Mr. Turnbull, on behalf of Defendants, testified that Defendants accepted the financial terms stipulated.[28] Magistrate Judge Hart inquired of Mr. Danois if he could make the payments, to which Mr. Danois responded, "I can make those payments."[29] At the time, neither Mr. Danois nor his counsel expressed any reservation about the Danoises' ability to meet the payment schedule.[30]

Mr. Danois, however, could not agree to Admissions 6 and 7. Defendants agreed to forego Admission 6 *only* (that Mr. Danois had stolen a computer server).[31] The Danoises' counsel at the time, Michael J. Salmanson, Esquire, adamantly opposed the language in Admission 7 since, as written, Plaintiffs contend that it potentially exposed them to a shareholder lawsuit; *to wit*:[32]

> The Danoises made forward-looking representations to the Board about i3's business opportunities and revenue projections that were never achieved and which turned out to be overly optimistic. By way of example, in January 2008, the Danoises projected that i3 would enjoy new business revenues in excess of $15 million in 2008, $60 million in 2009 and $100 million in 2010. However, i3's actual revenues from new business were $0 in each of these years.[33]

According to Mr. Terker, although Admission 7 was important to explain to the public how the Danoises misrepresented projections about the amount of new business i3 would obtain,[34] Defendants did not object to accommodating Mr. Salmanson's concern and would not stand in the way of reaching a settlement.[35] Thus, at the close of the October 30, 2013, settlement conference, Magistrate Judge Hart understood that the parties had reached an agreement on everything except the wording of Admission 7, and that counsel would jointly work on the release language. Neither party stated that a formal agreement would be required as a condition of being bound; neither party expressed a reservation that there was no agreement because there were open issues.[36]

Magistrate Judge Hart retained supervision over the negotiated settlement and requested that counsel for the parties send him a copy of the release. On February 18, 2014, Magistrate Judge Hart convened a counsel-only conference to

---

[27] Danois N.T. 42, 66.

[28] Turnbull N.T. 74.

[29] *Id.* at 73-74; Hart N.T. 76.

[30] Hart N.T. 9.

[31] *Id.* at 8-9.

[32] *Id.* at 77.

[33] *Id.* at 11.

[34] Terker N.T. 30; Hart N.T. 11-12.

[35] Turnbull N.T. 34.

[36] Hart N.T. 9-10.

discuss the drafts circulating between counsel.[37] Notably, the controversy over the language of Admission 7, now found as Paragraph 11 in a document entitled "Declaration of Derek Danois and Diane Hockstein Danois," still had not been resolved.[38]

On February 25, 2014, Defendants' counsel, Jennifer Snyder, Esquire, sent an email to Mr. Salmanson, copying Magistrate Judge Hart, advising:

> To follow up on my correspondence from Friday, I have discussed the declarations with my clients. To your (and your clients) possible surprise, they are willing to further edit [Paragraph] 11 by deleting the "overly optimistic" phrase all together and simply place a period after "achieved" to end the first sentence. I would think this eliminates a potential issue of concern for your clients.[39]

Hence, the controversial Admission 7 would read as: "The Danoises made forward-looking representations to the Board about i3's business opportunities and revenue projections that were never achieved."[40] Since Mr. Salmanson's principle concern was the potential that this admission would subject the Danoises to a shareholder lawsuit, Magistrate Judge Hart opined that the matter was resolved because the parties had finally reached an agreement as to wording that would eliminate Mr. Salmanson's concern, and "because that's what they wanted."[41]

On March 7, 2014, Mr. Salmanson withdrew from representing the Danoises, and Aaron Freiwald, Esquire, entered his appearance.[42] On May 7, 2014, Mr. Freiwald informed this Court in writing that counsel for both parties had discussed the matter and would exchange proposals for how they would proceed before approaching the Court, and if the parties could not come to an agreement, it was his understanding that Defendants would file a motion to enforce the settlement.[43] Ultimately, no agreement was reached,[44] prompting Defendants to file the motion to enforce settlement on July 17, 2014.

On September 16, 2014, Magistrate Judge Hart reconvened the parties and their counsel to discuss the motion to enforce settlement. Counsel for Plaintiffs represented that Plaintiffs had never agreed to the financial payment schedule nor to the Admissions, and that they wanted to "start over" settlement negotiations.

---

[37] Hart N.T. 10-11.

[38] *Id.* at 11-12.

[39] Hart N.T. 12; Feb. 25, 2014, email.

[40] *See* D-1.

[41] N.T. Hart 24.

[42] ECF 56, 57.

[43] Snyder Decl. ¶34; *see also* Snyder Decl. Exh. 7.

[44] Snyder Decl. ¶35.

Defendants objected to renegotiating any terms of the settlement that had already been reached.[45]

## DISCUSSION / CONCLUSIONS OF LAW

Undisputedly, "an agreement to settle a lawsuit, voluntarily entered into is binding upon the parties, whether or not made in the presence of the Court, and even in the absence of a writing." *McCune v. First Judicial District of Pennsylvania Probation Department*, 99 F.Supp.2d 565, 566 (E.D. Pa. 2000) (citing *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3d Cir. 1970)). Settlement agreements are essentially contracts, to which basic contract principles apply. *Williams v. Metzler*, 132 F.3d 937, 946 (3d Cir. 1997) (citing *New York State Electric & Gas Corp. v. F.E.R.C.*, 875 F.2d 43, 45 (3d Cir. 1989)); *see also California Sun Tanning USA v. Electric Beach, Inc.*, 369 F.App'x 340, 346 n. 6 (3d Cir. 2010). Plaintiffs, residents of Florida, commenced this action in Pennsylvania, where Defendants are citizens. This Court, therefore, having jurisdiction over this matter, will apply Pennsylvania substantive law to issues involving the enforcement of the settlement agreement. *See also Binder v. PPL Services Corp.*, 2009 WL 1674415, at *2 n. 2 (E.D. Pa. Jun. 15, 2009) ("[C]ourts typically apply Pennsylvania substantive law to disputes involving enforcement of settlement agreements because settlement agreements are interpreted according to traditional principles of contract law, and there is no conflicting federal interest.").

Pennsylvania law provides that where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement. Even the inability of the parties to an oral agreement to reduce such agreement to writing after several attempts does not necessarily

---

[45] N.T. Hart 14.

preclude a finding that the oral agreement was enforceable. *Commerce Bank/Pennsylvania v. First Union National Bank*, 911 A.2d 133, 145 (Pa.Super. 2006) (quoting *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999) (citations, brackets, and quotation marks omitted)); *see also Kazanjian v. New England Petroleum Corp.*, 480 A.2d 1153, 1157 (Pa.Super. 1984) ("An oral settlement agreement may be enforceable and legally binding without a writing."); *Johnston v. Jonston*, 499 A.2d 1074, 1076 (Pa.Super. 1985) (quoting *Courier Times, Inc. v. United Feature Syndicate, Inc.*, 445 A.2d 1288, 1295 (Pa.Super. 1982) ("If parties agree upon essential terms and intend them to be binding, 'a contract is formed even though they intend to adopt a formal document with additional terms at a later date.'")).

Under Pennsylvania law, a court may enforce a settlement agreement if: (1) both parties manifested an intention to be bound by the terms of the agreement; and (2) the terms are sufficiently definite to be specifically enforced. *Glenn Distributors Corp. v. Sanford, LP*, 2014 WL 1608481, at *1 (E.D. Pa. Apr. 22, 2014) (citing *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F.App'x 194, 200 (3d Cir. 2012)). In the course of enforcing a settlement agreement, a court may interpret its terms as a matter of law if the court finds that those terms are clear and unambiguous. *See Allied Erecting & Dismantling Co. v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001). One party's change of heart subsequent to a settlement agreement does not vitiate the agreement. *McClure v. Township of Exeter*, 2006 WL 2794173, at *2 (E.D. Pa. Sept. 27, 2006) (citing *Mercer v. Richardson Brands, Inc.*, 1992 WL 164711, at *3 (E.D. Pa. Jul. 2, 1992); *Gross v. Penn Mutual Life Ins. Co.*, 396 F.Supp. 373, 375 (E.D. Pa. 1975)). A settlement agreement is still binding, even when a change of heart occurs before an oral settlement agreement is reduced to writing. *Wyndmoor Learning Ctr. v. City of Wilmington*, 1996 WL 117471, at *6 (E.D. Pa. Mar. 12, 1996). Nevertheless, a meeting of the minds is necessary to

8

form an enforceable contract. *Id.*; *Vargo v. Manus*, 94 F.App'x 941, 943 (3d Cir. 2004) (citing *Power v. Tomarchio*, 701 A.2d 1371, 1374 (Pa.Super. 1997)).

In addition, there is a strong judicial policy favoring the voluntary settlement of lawsuits. "Permitting parties to void settlement agreements on a whim, because the agreement becomes unpalatable or the parties become greedier, 'would work a significant deterrence contrary to the federal policy of encouraging settlement agreements.'" *Bayer v. CitiMortgage, Inc.*, 2014 WL 4187556, at *3, slip op. (M.D. Pa. Aug. 22, 2014) (citing *Orta v. Con-Way Transp.*, 2002 WL 31262063, at *2 (E.D. Pa. Oct. 2, 2002) (quoting *D.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997)).

Here, Defendants argue that the parties came to a meeting of the minds on all material terms at the October 30, 2013 settlement conference held before Magistrate Judge Hart and, therefore, seek to enforce the oral agreement. Defendants further argued that no party made the execution of a *written* agreement a condition precedent to the enforcement of the oral agreement and the attempt to commit the oral agreement to writing does not create such a condition precedent. In contrast, Plaintiffs dispute that a settlement agreement was ever reached and argue that the financial framework was merely Magistrate Judge Hart's suggestion, not that of the parties', that there were still material terms that had not been worked out; and that the fact that Magistrate Judge Hart convened a settlement conference on September 16, 2014, was a further indication that there was no settlement agreement.

Based upon the findings of facts cited above, this Court disagrees with Plaintiffs' contentions and finds that Defendants have shown, by a preponderance of the evidence, that: (1) the parties manifested an intention to be bound by the terms of the agreement reached on October 30, 2013, as memorialized by Magistrate Judge Hart; and (2) that the terms of the agreement are

9

sufficiently definite to be specifically enforced. *See Glenn Distributors Corp.*, 2014 WL 1608481, at *1. That is, Defendants have established by the preponderance of evidence that, with respect to the financial component of the settlement agreement, the parties agreed on the financial liability amount owed by Plaintiffs; an amount which Magistrate Judge Hart suggested be paid in installments to ensure payment. There was no objection made to Magistrate Judge Hart's suggested payment schedule. This conclusion is strengthened by the fact that Magistrate Judge Hart queried Mr. Danois on his ability to make the payments and he assured Magistrate Judge Hart that he could meet this financial obligation,[46] an assertion Mr. Danois later denied uttering when questioned about it at the evidentiary hearing. Notwithstanding, according to Magistrate Judge Hart, who this Court finds has no vested interest in the outcome of this motion, neither Mr. Danois nor his then counsel at the settlement conference expressed any reservation about the Danoises' ability to adhere to the payment schedule.[47]

Further, from the trail of emails sent back and forth and arguments made, it is clear that the parties' main dispute related to the wording of Admissions 6 and 7; *to wit*: that Mr. Danois had stolen a computer server, and that the Danoises had misrepresented the new business projections to the Board of Directors. Magistrate Judge Hart conveyed at the evidentiary hearing that Defendants agreed to withdraw its insistence on the inclusion of Admission 6, and that the parties agreed to continue working on the language of Admission 7. Magistrate Judge Hart further stated that neither party expressed any doubt as to whether an agreement existed notwithstanding the issue of the language of Admission 7.[48] As previously mentioned, neither party stated that a formal written agreement would be required as a condition of being bound to the terms discussed.

---

[46] Turnbull N.T. 73-74; Hart N.T. 76.

[47] Hart N.T. 9.

[48] *Id.* at 9-10.

10

At the conclusion of the October 30, 2013 settlement conference, Magistrate Judge Hart testified that he reviewed with the parties the essential material terms of the settlement agreement; terms which the parties did not dispute and which are now considered in support of whether the parties' intended to be thereby bound. Consistent with Magistrate Judge Hart's belief, this Court finds that a "deal" had been reached. That is, an oral offer consisting of financial and non-financial components was made and accepted and the parties agreed to settle the claims asserted in the complaint and counterclaim. The fact that the parties were still working on the language of Admission 7 does not preclude this Court from finding that an oral agreement was made and is, therefore, enforceable. *See Commerce Bank/Pennsylvania*, 911 A.2d at 145. Clearly, the terms of the settlement agreement are sufficiently definite to be specifically enforced. Magistrate Judge Hart was unequivocal in his testimony, which was based on notes he made contemporaneously at the October 30, 2013 settlement discussions in the presence of the parties and their counsel and which he enumerated and repeated, and to which the parties assented. The terms of the settlement agreement were summarized, in part, by Plaintiff's then counsel, Mr. Salmanson, in a December 11, 2013, email to Ms. Snyder, Defendants' counsel, in which he wrote regarding the Danoises' issues with the first draft:

> *We agreed to a fairly simple settlement* – a fixed amount of money, payable over time with specific earnest payment, with reasonable default provisions in exchange for a settlement of claims …. Let me know if your clients are, in fact, prepared to enter into the settlement agreement under the terms *to which we actually agreed* ….[49]

Plaintiff cannot negate this assertion, more so given the fact that the Danoises' principle concern regarding the wording of Admission 7 was assuaged by Defendants' willingness to edit

---

[49] N.T. 63; *see also* Snyder Decl. ¶23, Exh. 2 (emphasis added).

the language, *albeit* at a later date, such that the Danoises would no longer be vulnerable to a shareholder lawsuit. As such, Defendants' belief that this matter was settled was reasonable.[50]

Although Mr. Danois now contends that counsel's email to Ms. Snyder is "a misrepresentation"[51] and that *he* understood that Magistrate Judge Hart was only making a proposal as to the financial payment schedule since he allegedly told the Judge that he could not make such payments,[52] this Court does not find these assertions credible. More so, since earlier in his court testimony, Mr. Danois admitted that the parties had agreed to the financial framework.[53] This Court also finds not credible Mr. Danois' assertions that it was not Plaintiffs' understanding that a final settlement had been reached on the non-monetary terms as Plaintiffs were not agreeable to the Admissions because 1) they were not true and 2) publicizing the Admissions would only serve to defame the Danoises.[54] However, the existence of other evidence does not support Plaintiffs' assertion that the Admissions were not true; *e.g.*, that Mr. Danois did not conceal his and Mrs. Danois' personal relationship or marriage,[55] which undermines his credibility when Judge Dalzell had previously found that there was substantial evidence to the contrary. In addition, Mr. Turnbull testified that the Danoises never disclosed their relationship or marriage to the Board of which he himself found out in December 2009 when Mr. Terker informed him that he found a marriage certificate.[56] Also true is the admission that Mrs. Danois engaged in outside legal practice when her i3 employment contract prohibited it. While Plaintiffs would like to challenge the veracity of *all* of the admissions, the only ones

---

[50] *See* Hart N.T. 22 ("... I thought they had reached an agreement, they had to come up with some way to solve that paragraph 11 which I thought they had done after my counsel only meeting and the e-mail I received.").

[51] Danois N.T. 64.

[52] *Id.* at 59.

[53] Danois N.T. 51.

[54] *Id.* at 41, 44, 53.

[55] *Id.* at 44.

[56] Turnbull N.T. 70-71.

ever challenged and that involved continued discussions on the wording or language were Admissions 6 and 7. After much give and take, Defendants voluntarily gave up on the inclusion of Admission 6 and greatly restructured the wording to Admission 7. Plaintiffs' newfound unwillingness to commit to the terms of the oral agreement, be it a change of heart or new legal advice, does not invalidate the terms of the oral agreement reached in October 2013, and finally hammered out in February 2014. *See McClure*, 2006 WL 2794173, at *2.

As a final note, the fact that Magistrate Judge Hart did not report the matter settled after the September 16, 2014, settlement conference does not alter the outcome of the October 30, 2013 settlement conference. Magistrate Judge Hart testified that he was under the impression that the parties had reached a settlement agreement, except for the wording of Admission 7, which was resolved after the February 18, 2014, counsel-only meeting and the February 25, 2014, email from Ms. Snyder. Magistrate Judge Hart testified that normally, his practice is to report to the assigned district court judge that a settlement agreement has been reached when he believes that the parties have done so. He further testified that he does not always adhere to his practice and in situations where he knows that a lot of settlement agreement release drafts will be exchanged, he "holds back" until he sees a signed agreement. Given the contentious history of this matter, Magistrate Judge Hart decided to be cautious and decided to wait for a signed settlement agreement. He assumed one would be forthcoming shortly after Ms. Snyder's February 24, 2014, email.[57]

## CONCLUSION

For the foregoing reasons stated herein, this Court finds that an oral agreement, which included specific and material terms regarding the disputes between the parties, was reached and

---

[57] N.T. Hart 26.

accepted to resolve all claims of the complaint and counterclaims among the parties. This oral agreement was made and accepted at a settlement conference presided over by Magistrate Judge Hart, with the understanding that a written release would be jointly drafted. In light of the facts presented, Defendants' motion to enforce the settlement agreement is granted. An appropriate order consistent with this memorandum opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.